

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00102-CV

———————————————

SISTER INITIATIVE, LLC; DAVID BAGWELL; AND SUSAN BAGWELL,
Appellants

V.

BROUGHTON MAINTENANCE ASSOCIATION, INC.; OLD GROVE
MAINTENANCE ASSOCIATION, INC.; AND WHITTIER HEIGHTS
MAINTENANCE ASSOCIATION, INC., Appellees

———————————————

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-256351-11

———————————————

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an appeal from a four-week bench trial. The reporter's record consists of fifteen volumes of testimony and argument and an additional five volumes containing hundreds of exhibits. The antagonists are Appellants David and Susan Bagwell and Sister Initiative, LLC on one side and three homeowners' associations—Appellees Broughton Maintenance Association, Inc.; Old Grove Maintenance Association, Inc.; and Whittier Heights Maintenance Association, Inc. (collectively, the HOAs)—on the other.

The Bagwells, who are husband and wife, served as directors of the nonprofit HOAs. During the time that the Bagwells were directors of the HOAs, loans were obtained from Sister Initiative, an entity owned by the Bagwells' daughters, on terms that made the HOAs liable for the loans' repayment. The Bagwells were subsequently ousted as directors of the HOAs, and litigation involving the loans ensued.

As the size of the record suggests, that litigation involved a host of issues. But the controversy before us centers on the trial court's judgment that found the loans from Sister Initiative to be invalid and unenforceable and that awarded the HOAs damages for the portions of the loans repaid to Sister Initiative. In essence, the trial court found that the Bagwells used the Sister Initiative loans as a means of funneling money to themselves while leaving the HOAs liable for the loans' repayment.

Appellants challenge the trial court's judgment with two broad issues: (1) the trial court erred by voiding the loans made by Sister Initiative and awarding the HOAs compensatory damages; and (2) the trial court erred by failing to enter a judgment awarding recovery on the loans in the same fashion as it did for another party that loaned funds to the HOAs.

We briefly summarize our disposition of the issues:

• The primary issues in this appeal involve the Bagwells' argument that they cannot be held liable for breach of fiduciary duty for entering into self-dealing transactions in the form of the loans because the boards of the HOAs authorized the loans in accordance with Section 22.230 of the Texas Business Organizations Code and because the loans were "fair" to the HOAs. We hold that the boards never properly authorized the loans in accordance with the requirements of Section 22.230 and reject the Bagwells' arguments challenging the trial court's findings and conclusions that the loans were not fair because they give us no legal basis to overturn those findings and conclusions.

• After disposing of the issues involving Section 22.230, we turn to a number of subsidiary arguments raised by Appellants:

    o Appellants' claims that the HOAs were not harmed by the making of the loans do not invalidate the judgment because their argument ignores the trial court's findings showing how the loans were implemented for a purpose that was harmful to the HOAs;

3

o    Appellants' claims that the Bagwells did not benefit from the loans fail because

■ The HOAs are not receiving a "windfall" from the trial court's voiding the loans, and

■ There are proper bases to hold Sister Initiative jointly liable for the Bagwells' breach of fiduciary duty;

o    Appellants suffered no harmful error from the trial court's entry of allegedly immaterial findings; and

o    Appellants do not have a viable claim for money had and received.

We therefore affirm the trial court's judgment.

## II. Factual and Procedural Background

We take much of the following background from the detailed findings of fact and conclusions of law signed by the trial court. We attach the findings and conclusions as an appendix to this opinion.

The Bagwells are in the business of real estate development. Through limited partnerships, they developed three neighborhoods in Tarrant County named Old Grove, Broughton, and Whittier Heights. As described below, the Bagwells owned and operated various legal entities, which are interrelated to their involvement with the neighborhoods; at the highest level of generality, the HOAs that became the

4

Bagwells' opponents in this litigation were the entities that the Bagwells had created "to serve as the homeowners association for each respective neighborhood."

The Bagwells acted as directors of each of the HOAs. Each HOA also had a third director, Dale Crane, who was a long-time friend and business associate of the Bagwells. This board structure was in place from the formation of the HOAs until the Bagwells and Crane were ousted as directors in August 2011.

Another major player in the litigation was Sister Initiative, LLC. The members of the LLC were the Bagwells' two daughters. Susan Bagwell served as the manager of the LLC.

A closer look at the various entities that underlie the Bagwells' operations involving the neighborhoods reveals a complicated and interlocking business structure. The trial court's fifth finding of fact identified each of the entities involved and their interrelation as follows:

> a. **The David Bagwell Company:** The David Bagwell Company ("DBCo") is a for-profit company formed during the marriage of the Bagwells, owned 100% by David Bagwell, and operated exclusively by, and for the benefit of, the Bagwells. At all times relevant, David Bagwell served as President and Treasurer of DBCo, and Susan Bagwell served as Vice President and Secretary of DBCo.
>
> b. **The Limited Partnerships:** Among the Bagwells' real estate developments are three neighborhoods located in Tarrant County as follows: Old Grove, Broughton, and Whittier Heights. The land whereupon these three neighborhoods are located was purchased and developed by limited partnerships formed at the behest of the Bagwells as follows: Old Grove LP, Broughton LP, and Broadland LP, respectively. The three limited partnerships were operated for a profit, and the general partner of each of the three limited partnerships is

DBCo.  As Manager of the general partner, David Bagwell solicited and received cash investments from third[ ]parties in exchange for limited partnership interests in each of the limited partnerships.

c. **Evermore Corporation:**  Evermore Corporation ("Evermore" or "EMC") is a for-profit company, formed during the marriage of the Bagwells, owned 100% by DBCo, and exclusively operated by the Bagwells.  At all times relevant, David Bagwell served as President and Treasurer of Evermore, and Susan Bagwell served as Vice President and Secretary of Evermore.

d. **Broadacre Partners:**  Broadacre Partners is a general partnership formed during the marriage of the Bagwells by David Bagwell and Dale Crane for the purpose of receiving a 49.5% "carried" or profit interest in each of the Limited Partnerships, without having invested any capital.  Broadacre Partners is owned 85% by Evermore Communities, Ltd. and 15% by Dale Crane.  By way of his interest in Broadacre Partners, Dale Crane had a financial interest in all of the Limited Partnerships.

e. **Evermore Communities, Ltd.:**  Evermore Communities, Ltd. is a limited partnership established by David Bagwell.  The sole limited partner of Evermore Communities, Ltd. is the David S. Bagwell Trust, which is managed by David Bagwell as trustee.  Evermore Corporation serves as the general partner of Evermore Communities, Ltd.

f. **Sister Initiative, LLC:**  Sister Initiative LLC ("Sister Initiative") is a for-profit limited liability company with two members and one manager.  The two members of Sister Initiative are the two daughters of the Bagwells, Meredith Carolina Bagwell Matlock and Sarah Brooke Bagwell Krueger.  Susan Bagwell served as the Manager for Sister Initiative.  The purpose, mission[,] and top priority of Sister Initiative is to support the Bagwell "family business."  Sister Initiative supports the Bagwell "family business" by making monetary investments in, or loans to, entities owned and/or controlled by the Bagwells, including DBCo, Evermore, and/or the Limited Partnerships.  At all times relevant, Sister Initiative was under the complete and exclusive control of the Bagwells.  Although neither a member nor manager of Sister Initiative, David Bagwell influenced and at times controlled its decisions and operations, and was an authorized signer on the Sister

6

Initiative bank account. A significant portion of Sister Initiative's capital came from money the Bagwells' daughters inherited from their deceased grandmother.

g. The foregoing business entities are sometimes referred to hereafter as the "Bagwell 'family business' entities."

Another entity involved in the controversy was Stonegate Financial Corporation, an entity owned by Crane.

According to the Bagwells, the recession of 2008 had a financial impact on the development of the neighborhoods. According to them, assessments needed to operate the various neighborhoods ceased to be paid. To avoid foreclosure, the Limited Partnerships developing the three neighborhoods were forced to file bankruptcy.

The Bagwells asserted that they retained Evermore Corporation to provide maintenance, accounting, and financial services to the HOAs that oversaw the three neighborhoods. The Bagwells claimed that because the assessments had dried up as a source of income, they took a number of steps to obtain funds, including seeking loans from third parties. As described in detail below, the HOAs consented to taking on loans and tasked David with seeking out lenders. According to his portrayal, outside lenders could not be located, and the Bagwells turned to Sister Initiative and Crane's company, Stonegate, to obtain loans. Between September and December 2010, the HOAs arranged a series of loans through Susan, who was acting as the manager of Sister Initiative. Stonegate also made loans to the HOAs.

Due to the dual role being occupied by Susan, she was an interested director in the loan transactions because she was serving as a director of each of the HOAs and as the manager of Sister Initiative. For this reason, the HOAs' boards had to authorize the loans or there had to be a showing that the loans were fair to the HOAs. *See* Tex. Bus. Orgs. Code Ann. § 22.230. Appellants contend that the authorization process occurred by virtue of the consents, which authorized David to seek a lender to address the HOAs' financial difficulties, and a blanket ratification of corporate acts that occurred shortly before the Bagwells were ousted as directors of the HOAs.

The loans made by Sister Initiative to the HOAs totaled approximately $120,000. There is a controversy on appeal regarding whether the loans were made pursuant to oral agreements or pursuant to written loan documentation. At trial and on appeal, the parties are at loggerheads regarding when the written loan agreements were prepared and executed, with the Bagwells arguing that the record shows that their actions were above board and with the HOAs contending that various documents were backdated. Another controversy that has a larger impact on this appeal is the use (or uses) to which the borrowed funds were put. Appellants contend that the funds went to pay the legitimate debts of the HOAs. The HOAs assert that the funds were funneled to improper uses.

A change in ownership of lots in the neighborhoods caused the August 2011 ouster of the Bagwells and Crane as directors of the HOAs. Sister Initiative and Stonegate demanded and then brought suit to recover on the loans made to the

HOAs. Filing suit to collect the loans produced a flurry of claims and counterclaims and the massive trial record that is inventoried above. In their counterclaims and third-party claims, the HOAs asserted causes of action for, among other things, breach of fiduciary duty, aiding and abetting, and civil conspiracy against the Bagwells, Crane, Sister Initiative, and Stonegate. The trial of the matter was heard by the court.

The final judgment awarded and denied various types of relief:

- The HOAs took nothing on their claims against Crane;

- Stonegate recovered the amounts due on its loans to the HOAs and attorney's fees;

- The notes representing the loans made by Sister Initiative to the HOAs were declared void and unenforceable;

- Sister Initiative took nothing on its claims against the HOAs; and

- The HOAs obtained a joint and several recovery against the Bagwells and Sister Initiative for the amounts each HOA had paid on the loans made by Sister Initiative.

In response to a request by Stonegate, the trial court entered the voluminous set of findings of facts and conclusions of law, which we referenced above. Sister Initiative and Stonegate both objected to the findings and conclusions and sought additional ones, which the trial court did not enter. Sister Initiative filed a motion for new trial, which appears to have been overruled by operation of law.

This appeal followed.

9

### III. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions, and we review the legal and factual sufficiency of the evidence supporting those findings using the same standards that we apply to jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). When the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for evidentiary sufficiency. *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We defer to unchallenged fact findings that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–97 (Tex. 1986)).

We do not conduct a free-ranging review of findings not attacked by an appellant; though some cases append a statement to the standard of review that a finding is invalid if no evidence supports it, we agree with the following statement from McDonald & Carlson Texas Appellate Practice that any implication from this statement—that we are obliged to test an unchallenged finding for evidentiary support—is an overstatement:

> If a finding of fact is not challenged on appeal, then the appellate court should not be considering the sufficiency of the evidence to support the finding. It is suggested that the [*McGalliard*] case [722 S.W.2d at 696–97]

and other similar cases should not be interpreted to mean that an appellate court may freely disregard a finding of fact at will whenever a reporter's record has been filed. Rather, these cases should be seen as instances when the appellate court was willing to evaluate the sufficiency of the evidence to support a finding of fact, even though the appellant attacked the judgment as a whole without attacking a specific finding of fact. These cases show a willingness on the part of some courts to forgive the appellant's failure to frame its appellate complaints with the expected degree of accuracy.

Roy W. McDonald & Elaine A. Grafton Carlson, *Texas Appellate Practice* § 18:12 n.3 (2d ed. 2019).

When the findings of the trial court are properly attacked, the standards of review provide the roadmap that the parties must follow to guide us in our determination regarding whether the findings are supported by the evidence. W. Wendell Hall, *Standards of Review in Texas*, 50 St. Mary's L.J. 1099, 1109 (2019) ("The standard of review is the framework by which a reviewing court determines whether the trial court erred."). We may sustain a legal-sufficiency challenge, that is, a no-evidence challenge, only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding

if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, and if no evidence supports the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

In a bench trial, the trial court makes credibility determinations, and "[a]s the factfinder, the trial court weighs the evidence and judges a witness's credibility, and the trial court may accept or reject any witness's testimony in whole or in part." *Brand v. Degrate-Greer*, No. 02-15-00397-CV, 2017 WL 1756542, at *7 (Tex. App.—Fort Worth May 4, 2017, no pet.) (mem. op. on reh'g) (quoting *In re Rhodes*, 293 S.W.3d 342, 344 (Tex. App.—Fort Worth 2009, orig. proceeding)). As with any factfinder,

12

the trial court may reject the testimony of an interested witness, even when that testimony is "uncontradicted and unimpeached." *Keller*, 168 S.W.3d at 820. The factfinder's credibility determinations must be reasonable, and the factfinder "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.*

## IV. Analysis of Appellants' First Issue

### A. The Sister Initiative loans were not properly authorized.

Most of the briefing in this case centers on Section 22.230 of the Texas Business Organizations Code that permits the directors of a nonprofit corporation to authorize a contract in which directors of the corporation are interested. Appellants concede that the loans required approval because they involved at least one director for the nonprofit HOAs who was an interested party in the loans: Susan was interested because she functioned as a director of the HOAs and as manager of Sister Initiative. Thus, the parties focus on whether the necessary authorization of the Sister Initiative loans occurred, whether a disinterested director voted to authorize the loans, and whether the loans were fair to the corporations—in this case, the HOAs. The trial court found that the loans were not voted on or approved. The record supports that finding. The trial court also found that there was a failure to prove that the loans were fair and equitable, and we conclude that Appellants do not viably attack those findings.

## 1. The text of Section 22.230 of the Business Organizations Code

Section 22.230 of the Business Organizations Code permits corporate approval of a self-dealing transaction, i.e., a contract "between a corporation and . . . (2) an entity or other organization in which one or more directors, officers, or members, or one or more affiliates or associates of one or more directors, officers, or members, of the corporation: (A) is a managerial official or a member; or (B) has a financial interest." Tex. Bus. Orgs. Code Ann. § 22.230(a)(2). Appellants concede that the Sister Initiative loans required board approval because they involved a contract between the HOAs and the interested directors.

Instead, Appellants argue that the Sister Initiative loans fell within the safe-harbor provision of Section 22.230(b) because either disinterested board members authorized the loans or there is proof that the loans were fair to the HOAs. *See id.* § 22.230(b). Section 22.230 provides a safe harbor through the following provision:

> (b) An otherwise valid and enforceable contract or transaction is valid and enforceable, and is not void or voidable, notwithstanding any relationship or interest described by Subsection (a), if any one of the following conditions is satisfied:
>
> > (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known by:
> >
> > > (A) the corporation's board of directors, a committee of the board of directors, or the members, and the board, the committee, or the members in good faith and with ordinary care authorize the contract or transaction by the affirmative vote of the majority of the disinterested directors, committee members[,] or members, regardless of whether

14

the disinterested directors, committee members[,] or members constitute a quorum; or

. . . .

(2) the contract or transaction is fair to the corporation when the contract or transaction is authorized, approved, or ratified by the board of directors, a committee of the board of directors, or the members.[1]

*Id.* The consequence of obtaining the approval of the board of directors in accordance with the quoted provisions of the statute insulates the parties to the contracts from claims for breach of fiduciary duty in making the contracts:

If at least one of the conditions of Subsection (b) is satisfied, neither the corporation nor any of the corporation's shareholders will have a cause of action against any of the persons described by Subsection (a) for breach of duty with respect to the making, authorization, or performance of the contract or transaction because the person had the relationship or interest described by Subsection (a) or took any of the actions authorized by Subsection (d).[2]

---

[1]Section 22.230 also permits members of the corporation to approve the contract. *See* Tex. Bus. Orgs. Code Ann. § 22.230(b)(1)(B). The HOAs state that this subsection does not apply because "it contemplates a vote of 'members entitled to vote.' The HOAs were operated by a board of directors. There were no members entitled to vote." [Internal record references omitted.] No one contends otherwise.

[2]Subsection (d) provides:

(d) A person who has the relationship or interest described by Subsection (a) may:

(1) be present at or participate in and, if the person is a director, member, or committee member, may vote at a meeting of the board of directors, of the members, or of a committee of the board that authorizes the contract or transaction; or

15

*Id.* § 22.230(e).

Here, Appellants argue that certain corporate approvals, which we will describe in detail below, demonstrate that the Sister Initiative loans were authorized in accordance with the quoted sections of the statute. Thus, they argue that they are insulated from the HOAs' claim for breach of fiduciary duty because the Sister Initiative loans were made in accordance with Section 22.230(b)'s safe-harbor provision.

The question of what corporate acts are sufficient to invoke Section 22.230's safe-harbor provision presents a question of statutory construction, which we review de novo. *See Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 131 (Tex. 2018). We determine the meaning of a statute by looking to the plain language of the statute:

> When construing a statute, our primary objective is to give effect to the [*l*]egislature's intent. We seek that intent "first and foremost" in the statutory text, and "[w]here text is clear, text is determinative" of intent. "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results."

*Colorado Cty. v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017) (citations and footnotes omitted).

---

> (2) sign, in the person's capacity as a director, member, or committee member, a written consent of the directors, members, or committee members to authorize the contract or transaction.

Tex. Bus. Orgs. Code Ann. § 22.230(d).

## 2. The Sister Initiative loans did not receive the necessary authorization.

We next examine whether the Sister Initiative loans were authorized and fair. The HOAs attack whether the loans were "authorized" on two fronts. The first front, as set forth in Appellants' issue 1.2.1(a), is whether the third director of the HOAs, Crane, acted as a disinterested director who had the power to authorize a self-dealing transaction, such as the Sister Initiative loans. The second attack, also set forth in Appellants' issue 1.2.1(a), focuses on whether there was ever an appropriate vote by the corporation that authorized the loans. We conclude that the record supports the trial court's finding that no adequate vote occurred, and we do not reach the question of whether Crane was disinterested or whether his vote would have been enough to constitute approval of the loans.

### a. Appellants attack the trial court's findings that the loans were not authorized.

The following are the trial court's findings that the loans were not authorized:

99. The ex-Directors created and executed a back-dated Consent for each of the HOAs dated June 10, 2010, which did not authorize the ex-Directors to enter into any loans with Sister Initiative or Stonegate. There is no credible evidence that any of the loans or purported loan documents, that form the bases of Sister Initiative's claims and Stonegate's claims, were considered, voted on, and/or approved by the board members of the HOAs at any time prior to September 1, 2011.

. . . .

103. With regard to the Sister Initiative loan documents, there was a failure to prove, by a preponderance of the credible evidence, a date upon which any such loan documents were authorized, approved,

or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

. . . .

105. With regard to the Sister Initiative loan documents, there was a failure to prove, by a preponderance of the credible evidence, that any such alleged written agreements were authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

. . . .

113. To the extent money was transferred from Sister Initiative to any of the HOAs, there was a failure to prove, by a preponderance of the credible evidence, that any such particular transfer of money constituted a loan that was authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

In challenging these findings, Appellants do not contend that there were specific resolutions authorizing the Sister Initiative loans. Instead, their argument focuses on two actions by the boards that they claim constitute proper authorization under the provisions of Section 22.230. These acts were consents passed by the boards and a subsequent ratification. We disagree that either the consents or the ratifications constituted an approval that met the requirements of the statute.

**b. We conclude that the purported consent of the HOAs' boards to obtain the loans from Sister Initiative does not constitute sufficient authorization of the Sister Initiative loans.**

Appellants claim that the HOAs' boards authorized the loans via consents. We disagree for the following reasons:

• Whether the HOAs passed the consents presented a fact question that the trial court resolved adversely to Appellants.

o Even if the consents were passed in the form and at the time Appellants claim, the consents are not sufficient authorization under Section 22.230. The consents do not meet the standards of the statute because they do not authorize the specific loans made by Sister Initiative. Further, the consents were passed before it was even contemplated that a transaction requiring the authorization required by Section 22.230 would occur. At the time the consents were passed, the directors did not—and indeed could not—know the material facts about the transactions that they were asked to authorize. Thus, they did not have the information necessary to make the decision the statute calls on them to make, nor did they have the ability to make that decision exercising the good faith and ordinary care required by the statute.

19

**(1)    The record reveals that the HOAs' boards consented to the obtaining of loans, at most.**

With respect to the consents, Appellants describe how the boards of the HOAs "consented" to the Sister Initiative loans as follows:

> In June 2010, the board of each HOA, comprising the Bagwells and Crane, unanimously agreed and authorized David Bagwell to obtain financing for each of the HOAs, and—after failing to obtain financing from other sources—Bagwell obtained financing from Sister Initiative. At trial, Susan Bagwell specifically testified that Crane approved Sister Initiative's loans. And David Bagwell testified that Sister Initiative's loans were all approved by the board, which included Crane. [Citations omitted.]

This quote does not capture the complete picture of the process Appellants rely on for their contention that the HOAs' boards had authorized the loans. The HOAs were apparently in financial trouble. The boards authorized David to search for lenders. That process was embodied in consents dated June 1, 2010, for each of the HOAs, and those consents contained the following terms:

> WHEREAS, the Board of Directors for the Corporation has determined that significant amounts of assessment payments are delinquent; and
>
> WHEREAS, cash presently available is insufficient to pay the bills and the obligations of the Association[;] and
>
> WHEREAS, the Corporation has obtained advice of counsel that borrowing funds under such circumstances is authorized by the Articles of Incorporation and the Bylaws of [the relevant HOA] and received from counsel standard loan documentation for such borrowing purposes;
>
> RESOLVED, that the Board of Directors of the Association hereby authorizes the President to execute promissory notes on behalf of the Association borrowing funds based all or in part on such standard

20

loan documentation with such terms and conditions as the President may determine, including but not limited to being secured by accounts receivable and future payment of assessments received and giving priority application of same to repayment of said promissory notes, in amounts sufficient to meet some or all anticipated obligations of [the relevant HOA].

FURTHER RESOLVED: that all acts, transactions, and agreements undertaken by any of the directors or officers of the Corporation in its name or on its behalf since the Organizational Meeting of [the relevant HOA], including all acts, transactions, and agreements in connection with the implementation of the foregoing resolution, are hereby ratified, confirmed, and adopted by the Corporation.

As noted above, the loans were made by Sister Initiative between September and December 2010—more than three months after the consents were approved.

The Bagwells and Crane testified at various places in the record that the specific loans were approved or discussed with the boards, but the record does not contain any resolutions—other than the quoted consents—that authorized each of the Sister Initiative loans. Indeed, David testified that he could not recall seeking individual approval for the loans:

Q. You confirmed in your deposition that you did not go back to the boards to seek approval for individual loans once you had this approval to go seek the loans, right?

A. I don't recall that I went back to the board to seek individual approval.

Susan also testified that that the HOAs' boards approved the loans in general but did not approve the individual loans from Sister Initiative. Specifically, when asked if there were specific approvals, she testified as follows:

21

Q. The truth is, there was never a vote to approve each of the individual loans made the basis of this lawsuit, was there?

A. Each of the loans?

Q. Correct.

A. There were approvals, but not individually, one, two, three, if that's what you mean.

And Susan's testimony confirmed that the approvals she had referenced were the quoted consents:

Q. . . . ["]Was there a vote to approve each one of these loans?[']

["]Your answer?"

A. "No."

Q. Do you recall Exhibit 1 [the quoted consents], Mrs. Bagwell? This was that consent document that we asked Mr. Bagwell about --

A. Yes.

Q. -- dated June 1, 2010, where the board authorized him to go negotiate, seek -- seek funding. You remember that?

. . . .

Q. Okay. So since we know there was no separate vote by the board to approve any of these individual loans, this -- these consent documents that are Exhibit 1 are the only association documents that the board can point to for authority for the -- for the loans; isn't that right?

A. I'm sorry. Since there was not an individual consent for each one what?

Q. Right. In other words, you -- you -- you agree with Mr. Bagwell's testimony the other day that there's not a separate consent like this each

22

time those loans that [the attorney for one of the HOAs] was asking you about -- $5,000 was going to be made to Old Grove --

A. That's right.

Q. -- you didn't do a new vote and a new approval, did you? Right?

A. No.

Q. Okay. So this is the -- These are the authority documents that you're relying on, true, one for each -- Old Grove, Broughton, Whittier --

A. Correct.

Q. -- all dated June 1, 2010, right?

A. Yes.

Susan also acknowledged that the consents did not authorize loans from insiders of the HOAs:

Q. Okay. And -- And you just had a chance to look at this, right, Mrs. Bagwell?

We know these consents don't specifically authorize Mr. Bagwell to take loans from insiders or related entities like Sister Initiative or Stonegate, do they?

A. That wasn't the plan. But it says that --

Q. They don't authorize --

A. Your question was they don't specifically authorize those ones. That's right.

At trial and on appeal, the HOAs challenge that the consents were approved on the June 1 date recited in them and whether the board meeting allegedly occurring on that date had actually occurred. Specifically, the consents reference advice from the

law firm of Riddle and Williams, but the HOAs noted that the entries on the bills from that law firm started weeks after the dates of the consents and the board meeting referenced in them.

When challenged, Susan acknowledged that the law firm had not been hired at the time of the consents, but she still denied that the consents had been created after the fact:

> Q. Okay. The truth is, Mrs. Bagwell, we know that Lance Williams was the association's lawyer and did provide loan documentation, but he did that at the end of September 2010, didn't he?
>
> A. Yes.
>
> Q. And we now know that you hadn't even engaged Riddle & Williams on June 1, 2010, had you?
>
> A. That's right.
>
> Q. Isn't this -- These documents, Exhibit 1, these consents, aren't these just more examples of documents that were backdated in an effort to make the board's actions in making these loans appear legitimate?
>
> A. No.
>
> Q. The truth is, Mrs. Bagwell, there was no meeting on June 1, 2010, and there was no advice of counsel as of that date approving these loans from interested parties, was there?
>
> A. That's incorrect.

**(2) We conclude that the trial court properly found that the consents did not constitute sufficient authorization of the Sister Initiative loans.**

The consents do not invalidate the trial court's findings that the loans were not authorized or approved by the HOAs' boards. We have two bases for this holding: one is that credibility determinations fall to the trial court in a bench trial, and the other is that the blanket consents in this case do not meet the requirements of Section 22.230 of the Business Organizations Code.

The HOAs' challenge to the conflict between the date of the consents and the recitation of the date of the legal advice that was the basis of the consents presented the trial court with a credibility question as to whether the consents were backdated and, thus, put into question the authenticity of the consents. Also, as we note below, the trial court heard testimony challenging whether many of the loan documents, other than the consents, were created at the time the Bagwells represented that they were created.

As we noted in our recitation of the standards of review, the trial judge in a bench trial makes credibility determinations, and the testimony of an interested witness creates a question of credibility unless it is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *See Keller*, 168 S.W.3d at 820. The testimony with respect to whether the consents came into existence as described by the Bagwells threw the question of

25

the consents' authenticity into the realm of a credibility determination, which is not in our realm to question.

But even if the evidence were uncontroverted that the consents occurred as and when the Bagwells contend, the consents are inadequate. The consents occurred before the Sister Initiative loans were contemplated and did not reference any transaction between the HOAs and an interested party. A blanket preauthorization of this type does not meet either the language of Section 22.230 or its purpose. *See* Tex. Bus. Orgs. Code Ann. § 22.230.

The language of Section 22.230 provides that an otherwise enforceable contract or transaction is valid and enforceable if "*the material facts as to the relationship or interest and as to the contract or transaction are disclosed to or known* by: (A) the corporation's board of directors . . . [,] and the board . . . *in good faith and with ordinary care authorize[s] the contract or transaction* by the affirmative vote of the majority of the disinterested directors." *See id.* § 22.230(b)(1)(A) (emphasis added). The terms of the section refer in multiple locations to "*the* contract or transaction." *Id.* (emphasis added). That reference establishes that the board of directors' duty is to authorize a particular contract or transaction. To read the statute to mean a resolution that authorizes any class of transaction—such as a loan that has not even occurred—would turn the approval process into a meaningless formality. The statute provides that the directors will exercise good faith and ordinary care in deciding to authorize the transaction. *Id.* A consent that simply references a class of transactions such as "loans" does not carry

26

out the need to show that a particular loan, i.e., "the contract or transaction" was authorized. *See id.*

More tellingly, at the time of the consents, it was not known who the lender was to be or that the identity of the lender would even implicate the need for approval under Section 22.230 because the loans involved a contract or transaction with an interested director. *See id.* § 22.230. Without knowing this, directors could not make the decision that Section 22.230 calls on them to make. Specifically, the information upon which the directors were to base their approval—"the material facts as to the relationship or interest and as to the contract or transaction"—were not known. *See id.* Thus, it would be impossible for the directors to make the informed vote that Section 22.230 contemplates. Without knowing who was involved in the contract or transaction or the nature of the interested relationship that prompted the need for the vote, the directors could hardly fulfill their duty to make a decision in good faith and with ordinary care.

In their brief, Appellants challenge this conclusion by noting that the Government Code requires the singular to include the plural and by formulating the following argument:

> Section 22.230(b)(1)(A) says that a "contract or transaction is valid and enforceable" if the board "authorize[s] the contract or transaction by the affirmative vote of the majority of the disinterested directors." As noted, in Texas "[t]he singular includes the plural and the plural includes the singular." Tex. Gov't Code [Ann.] § 311.012(b). Thus, Section 22.230(b)(1)(A) can be read as saying "contracts or transactions are valid and enforceable" if the board "authorize[s] the contracts or transactions

by the affirmative vote of the majority of the disinterested directors." In other words, under a fair reading of Section 22.230, a board can "vote" (singular) to approve a series of related "contracts" (plural)—like when the HOA boards unanimously agreed to take loans from Sister Initiative. *Cf. Dallas Symphony Assoc., Inc. v. Reyes*, 571 S.W.3d 753, 759 (Tex. 2019) (stating "goal" of statutory interpretation is "'fair' reading of the language").

This argument might have some sway if the consents' only failings were that they authorized multiple contracts or transactions. But their defects go far beyond this and fail for the reasons that we described above by authorizing an interested-party contract or transaction without even knowing there was an interested party involved or who that party was or giving any means to analyze the fairness of the terms of the contract or transaction.

### c. We conclude that the purported ratification of the Sister Initiative loans does not constitute sufficient authorization for the loans under Section 22.230.

Appellants also argue that another corporate act brought the loans within the safe harbor of Section 22.230—a ratification of all corporate acts that occurred shortly before the Bagwells were ousted as directors of the HOAs. We disagree. Our reasons for disagreeing are as follows:

• The ratifications make no reference to the Sister Initiative loans and do not conform to the requirements of Section 22.230;

• Such a general ratification is inadequate under Texas law to permit a self-dealing transaction; and

• The form of such a general ratification is invalid.

28

**(1) The record reveals that the HOAs did not ratify the Sister Initiative loans.**

The Bagwells and Crane testified that the HOAs had adopted ratifications of prior board actions shortly before they were removed as directors of the HOAs. There is no dispute about the terms of the ratifications. Their terms show that they did not take the form of ratifying specific actions but were an effort to bless every action that the HOAs had ever taken before their passage:

> The undersigned, being all of the directors of [the respective HOA], a Texas corporation (the "Corporation"), hereby adopt the following resolution:
>
> WHEREAS: the Board of Directors for the Corporation voted unanimously on August 1, 2011, to reconfirm and uphold all acts, transactions, or agreements undertaken prior to this consent by any of the officers or directors of the Corporation, in its name or on its behalf since the Organizational Meeting of [the respective HOA];
>
> RESOLVED: that all acts, transactions, or agreements undertaken prior to this consent by any of the officers or directors of the Corporation, in its name or on its behalf since the Organizational Meeting of [the respective HOA], including all acts, transactions, and agreements in connection with the implementation of the foregoing resolution, are hereby ratified, confirmed, and in all things adopted and upheld by the Corporation.

**(2) We conclude that the trial court properly found that the ratifications did not constitute sufficient authorization of the Sister Initiative loans.**

Appellants argue that the ratifications' general blessing of any prior act of the directors should be given an all-encompassing effect that includes giving the Sister Initiative loans any necessary approval called for by Section 22.230. Their reply brief

29

articulates this argument as follows: "when each HOA ratified 'all' its prior agreements on August 1, 2011, this was the legal equivalent of previously authorizing each of the loans individually—the last of which was made on June 30, 2011." This argument ignores the language of the statute and the traditional method of ratifying self-dealing transactions. *See* Tex. Bus. Orgs. Code Ann. § 22.230(b)(1)(A).

We disagree that a ratification as broad as the one that Appellants rely on is sufficient. We held above that the consents that merely authorized "loans" did not meet the statute's requirement to show that the directors had properly exercised their duty to approve "the contract or transaction." The ratifications have an even higher level of generality and reconfirmed "all acts, transactions, and agreements" entered into in the period between the formation of the HOAs until the date of the resolution. If the consents were a rubber stamp that undermined the statute's express purpose of demonstrating that the directors had made an informed approval in good faith and with the ordinary care required, the ratifications are an even dimmer stamp.[3]

---

[3]The HOAs argue that a "ratification" is not a sufficient corporate act to satisfy the approval provisions of Section 22.230(b)(1)(A) because that subsection does not refer only to acts that "authorize the contract or transaction by the affirmative vote." *See* Tex. Bus. Orgs. Code Ann. § 22.230(b)(1)(A). Because the word ratification is not used in the statute, the HOAs appear to argue that an act of ratification is not an authorization by an affirmative vote. Appellants respond that "there is no legal difference between an affirmative vote and ratification." We do not reach the question of whether a ratification would constitute an affirmative act of authorization because we conclude that the specific ratifications relied on by the Bagwells are insufficient to conform to Section 22.230.

Further, a reading of Section 22.230 as requiring the approval or authorization to contain at least a reference to the specific contracts or transactions being ratified conforms to Texas cases that have traditionally specified that the ratification of self-dealing transactions requires the specific approval of directors. *See Lifshutz v. Lifshutz*, 199 S.W.3d 9, 21 (Tex. App.—San Antonio 2006, pets. denied) ("Transactions between corporate fiduciaries and their corporation are capable of ratification by the shareholders or, as occurs more commonly, by the board of directors' specific approval or acquiescence, laches, or acceptance of benefit."); *Gen. Dynamics v. Torres*, 915 S.W.2d 45, 50 (Tex. App.—El Paso 1995, writ denied) ("It is the general rule in Texas that transactions between corporate fiduciaries and their corporation are capable of ratification by the shareholders or, as occurs more commonly, by the board of directors' specific approval or acquiescence, laches, or acceptance of benefit."). As set forth above, the wording of Section 22.230 specifies that "the corporation's board of directors . . . in good faith and with ordinary care authorize *the* contract or transaction by the affirmative vote of the majority of the disinterested directors." Tex. Bus. Orgs. Code Ann. § 22.230(b)(1)(A) (emphasis added). The use of the definite article indicates that the section carries forward the traditional requirement of specific approval and does not work a change in the law where a blessing of every act since the corporation's creation qualifies.

A legislative pronouncement of recent vintage reinforces our view that the attempt to perform an after-the-fact mass blessing of every corporate act in the form

of a blanket ratification is not sufficient. In 2019, the legislature mandated the form of resolutions used by nonprofit corporations to ratify defective corporate acts. Any resolution ratifying such acts must state

> (1) the defective corporate act or acts to be ratified; (2) the date of each defective corporate act; (3) the nature of the failure of authorization with respect to each defective corporate act to be ratified; and (4) that the board of directors approves the ratification of the defective corporate act or acts.

*Id.* § 22.503(a).[4] The specificity required by such resolutions appears to carry out the principle from case law that we discussed—that an act of ratification must be specific—and reinforces our conclusion that a blanket absolution by a general ratification does not meet the requirements of Section 22.230. Accordingly, we overrule Appellants' issue 1.2.1(a).

> ### d. Whether the agreements to lend were oral or in writing does not impact the question of whether the HOAs' boards properly authorized the loans.

The parties spend a great deal of time on an argument that we do not believe holds much sway in the discussion of whether the consents and ratifications constitute the approval required by Section 22.230. The HOAs challenge whether the written loan agreements were prepared as Appellants contended. According to the HOAs, the agreements were prepared after the Bagwells and Crane were no longer

---

[4]Although the provision governing the ratification of defective acts by a nonprofit corporation was passed in 2019, a similar act governing for-profit corporations was passed in 2015 and was amended in 2017. *See* Act of May 4, 2015, 84th Leg., R.S., ch. 32, § 21.903, 2015 Tex. Sess. Law Serv. 985–86 (amended 2017) (current version at Tex. Bus. Orgs. Code Ann. § 21.903(a)).

directors and were then backdated. In issue 1.2.2, Appellants challenge whether the HOAs' backdating argument has support in the record. Appellants also argue that even if the written agreements were invalid, the statute of frauds did not require a written agreement for loans in the amounts made by Sister Initiative to the HOAs and that for this reason, Sister Initiative could enforce oral contracts to lend. The parties' disagreement has no impact on our resolution of the question of whether the Sister Initiative loans received the approval required by Section 22.230. Whether the loan agreements were written or oral, they embodied contracts or transactions between the corporations and interested directors. Thus, they required the approval specified in Section 22.230. *Id.* § 22.230. The consents and ratifications did not provide the necessary approval no matter the form of the underlying loan agreements.[5] We thus overrule Appellants' issue 1.2.2.

---

[5]Though it is not the basis for our holding, we note that even if the loans were appropriately authorized under Section 22.230, we question whether that authorization would bar a claim for breach of fiduciary duty. First, Section 22.230 provides an approval process only for "[a]n otherwise valid and enforceable contract or transaction." *See* Tex. Bus. Orgs. Code Ann. § 22.230(b). Second, approval does not appear to forestall a claim for breach of fiduciary duty but prevents only a claim based on the fact that a director is interested:

> [N]either the corporation nor any of the corporation's shareholders will have a cause of action against any of the persons described by Subsection (a) for breach of duty with respect to the making, authorization, or performance of the contract or transaction *because the person had the relationship or interest described by Subsection (a) or took any of the actions authorized by Subsection (d).*

**B.  We reject Appellants' argument that we should conclude that the Sister Initiative loans were fair.**

Section 22.230 also provides that a contract or transaction involving an interested director is valid and enforceable if "the contract or transaction is fair to the corporation when the contract or transaction is authorized, approved, or ratified by the board of directors, a committee of the board of directors, or the members." *See id.* § 22.230(b)(2).  In issue 1.2.1(b), which consists of a two-and-a-half-page argument without any citations to authority, Appellants argue that the Sister Initiative loans were fair to the HOAs.  Their argument does little to attack the trial court's findings that focus on the fairness issue and instead relies on a claim of contradiction between the trial court's refusal to permit Sister Initiative to recover on its loans while permitting a recovery by Crane's company, Stonegate.  At the most basic level, this approach makes no valid challenge to the trial court's findings because it begs the question of

---

*See id.* § 22.230(e) (emphasis added).  Third, we have previously held that Section 22.230's sister provision governing for-profit corporations does not absolve directors of breach of fiduciary duty claims. *See Corley v. Hendricks*, No. 02-16-00293-CV, 2017 WL 1536210, at *3 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) (mem. op.) ("Interested directors and shareholders cannot give effective consent to breaching their fiduciary duty to the company by stealing from the company at the expense of other directors and shareholders." (citing Tex. Bus. Orgs. Code Ann. § 21.418(b))). Fourth, the common law did not permit a ratification to free a party from a claim for breach of fiduciary duty when the transaction was unfair or did not benefit the fiduciary. *See Gen. Dynamics*, 915 S.W.2d. at 50 ("Additionally, there can be no ratification of 'an act which is not done in behalf of[]' the corporation. '[R]atification can only be effectual between the parties involved when the [fiduciaries'] act is done openly and admittedly for the [corporation], and not when done for the [fiduciaries'] expressed benefit . . . .'" (quoting *Herider Farms–El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 477–78 (Tex. App.—El Paso 1975, writ ref'd n.r.e.))).

why the trial court's determination of the fairness question on the Sister Initiative loans was error. On a more specific level, we will attempt to construe the arguments that Appellants appear to make and respond to them.

Specifically, the trial court made the following findings:

109. With regard to the Sister Initiative loan documents, there was a failure to prove, by a preponderance of the credible evidence, that the terms of such written agreements were fair and equitable to any of the HOAs on or about any of the dates on which such alleged written agreements were allegedly signed by Mr. Bagwell on behalf of the HOAs.

. . . .

114. To the extent money was transferred from Sister Initiative to any of the HOAs, there was a failure to prove, by a preponderance of the credible evidence, that any such particular transfer of money constituted a loan that was fair and equitable to the HOA that allegedly received such transfer of money.

The trial court also made the following conclusion of law: "31. The terms of the putative Sister Initiative loan documents were not fair to the HOAs at or about the time of the putative dates of the putative loan documents."

Appellants' first criticism of the findings is that "the trial court provides no specific basis for this conclusion—meaning the court says the loans are unfair, but fails to say why." This criticism is unfounded for both a factual and a legal reason. First, the trial court did explain at least part of the "why" with the following finding:

115. To the extent money was transferred from Sister Initiative to any of the HOAs, the Bagwells did not intend that money to be used for the benefit of the HOAs but, at all times relevant, intended that money to further the personal and business interests of the Bagwells and the

35

Bagwell family business entities, at the expense or to the detriment of the HOAs.

Second, the argument attempts to impose a burden on the trial court that it does not bear because "[a] trial court is required to enter findings and conclusions only on ultimate or controlling issues." *In re M.J.G.*, 248 S.W.3d 753, 763 (Tex. App.—Fort Worth 2008, no pet.). "[T]he trial court [is] not required to make findings specifically targeted to this evidence; findings that simply address how or why the trial court resolved the ultimate fact in a particular way are merely evidentiary and need not be entered." *Id.* The trial court met its obligation to make findings on the ultimate issue of fairness and had no obligation to elaborate on why it did so.

Next, Appellants argue that "[i]t is difficult to square the trial court's finding of unfairness with the indisputable evidence that the HOAs benefitted from the loans, insofar as they received much needed funds to pay their overdue bills." In support of this statement, they cite less than one page of testimony from an accountant retained by the Bagwells.[6] As noted at the outset of this opinion, the reporter's record in this

---

[6]The extent of the testimony is as follows:

Q. With regard to loans that were made by Sister Initiative and Stonegate, were the monies that came in --

First off, monies did come in from those loans, correct?

A. Yes. That's correct.

Q. And you booked them at or about the time they came in, correct?

36

case consumes twenty volumes, and in essence, we are asked to view one page of this voluminous record as conclusive proof that the evidence does not support the finding based on only a one-sentence argument telling us that the one page is difficult "to square" with the finding.

Even if that were an adequate argument that prompted us to conduct an analysis of the evidence supporting a particular finding, the witness's testimony was

A. Correct.

Q. At some time after the money came in, the money typically went back out; isn't that true?

A. That's true.

Q. And when the money went back out, what did it go to do?

A. To pay bills.

Q. And were these, for the most part, bills that had been on the books of these respective maintenance associations for quite a bit of time?

A. Yes.

Q. Were the bills actually due and owing?

A. I believe they were past due.

Q. Okay. With regard to those bills, were some of those bills to Evermore Corporation?

A. That's correct.

Q. And if they were paid to Evermore Corporation, what might those bills have been for -- or what were those bills for? How about that?

A. It would have been for landscape services or maintenance services or bookkeeping/management services.

not conclusive. Thus, the credibility and weight to be given to her testimony was a matter for the trial court to decide. *See Brand*, 2017 WL 1756542, at *7. For example, the trial court could have considered that the witness presenting the testimony had repeatedly invoked her Fifth Amendment right against self-incrimination during one of her depositions even though she apparently later testified regarding the same topics.

Indeed, the trial court made findings indicating that it found the witness's testimony not credible, and Appellants do not challenge those findings. The trial court made findings directly dealing with the credibility of the Bagwells' accountant's testimony and their use of the HOAs' funds:

36.  Pamela Cariaga and PJC Accounting handled accounting and bookkeeping functions for the HOAs, as well as the other Bagwell "family business" entities.

37.  The ex-Directors failed to provide an accounting for how HOA money was spent by the ex-Directors during the time they served as Officers and Directors of the HOAs.

38.  The ex-Directors failed to introduce credible evidence to prove that the HOAs benefitted from the HOA money spent during the time they served as Officers and Directors of the HOAs.

39.  The Court was unable to determine, based upon a preponderance of the credible evidence, that HOA money was not improperly used to benefit the Bagwells and/or the Bagwell "family business" entities, including Sister Initiative, DBCo, and the Limited Partnerships.

40.  There was a failure to prove, by a preponderance of the credible evidence, that HOA money was not used to pay for the

accounting and bookkeeping services provided by Pamela Cariaga and/or PJC Accounting for the Bagwell "family business" entities.

    41.  HOA money was improperly used to benefit the Bagwells and/or their "family business" entities, including Sister Initiative, DBCo, and the Limited Partnerships.

The trial court made other findings addressing the use of the funds loaned to the HOAs, and those findings are unchallenged:

114.  To the extent money was transferred from Sister Initiative to any of the HOAs, there was a failure to prove, by a preponderance of the credible evidence, that any such particular transfer of money constituted a loan that was fair and equitable to the HOA that allegedly received such transfer of money.

    115.  To the extent money was transferred from Sister Initiative to any of the HOAs, the Bagwells did not intend that money to be used for the benefit of the HOAs but, at all times relevant, intended that money to further the personal and business interests of the Bagwells and the Bagwell family business entities, at the expense or to the detriment of the HOAs.

Thus, it is not difficult to "square" the trial court's findings regarding a lack of fairness when it was entitled to make a credibility determination and reject the testimony that Appellants relied on, and Appellants make no effort to challenge the findings that impact the credibility of the testimony they offered.

Next, Appellants argue that the failure to determine that the loans were fair unravels because "the trial court implicitly found that the HOAs did, in fact, benefit from the loans, when it expressly rejected the HOAs' proposed finding that they didn't." The finding that Appellants reference was one that the trial court had struck through: "116. ~~To the extent money was transferred from Sister Initiative or~~

~~Stonegate to any of the HOAs, the HOAs received no material benefit from such money as it was almost immediately removed from the HOAs' bank accounts by the Bagwells to further the personal and business interests of the Bagwells and the Bagwell family business entities~~." Appellants ask us to read a great deal into the trial court's strike-through of this one finding, especially in the face of the other findings that the trial court actually made. We do not know what aspect of the finding's language or basis that the trial court disagreed with, but to argue that the strike-through should be read as an implicit finding that the HOAs in fact benefited from the loans is an unsustainable leap.

The core of Appellants' challenge to the fairness determination is the disparate treatment of the Sister Initiative loans and the Stonegate loans based on the trial court's entering judgment in Stonegate's favor. Appellants argue that the terms of the Sister Initiative loans and the Stonegate loans were virtually identical and that the HOAs raised similar challenges of unfairness and breach of fiduciary duty to the loans from both Stonegate and Sister Initiative. Because the trial court found that the Sister Initiative loans to the HOAs lacked the necessary approval under Section 22.230,

> the trial court would've had to rely on the fairness of Stonegate's loans to rule in Stonegate's favor, under Section 22.230—and there is simply no way to reconcile the trial court's judgment enforcing Stonegate's loans as "fair" with its judgment simultaneously voiding Sister Initiative's loans as "not fair." Such a discrepancy in judgments, for virtually identical loans, is arbitrary and capricious.

40

The logical starting point for this argument is that if we find an inconsistency in the rulings that the trial court made for different parties, we have a basis to reverse the judgment. But Stonegate is not a party to this appeal; the only issue we have before us is the correctness of the judgment involving Sister Initiative. To reverse the judgment, Appellants bear the burden of showing error not in the relief granted to another party but in the relief granted in the judgment that resolved their claims. *See Ferguson v. DRG/Colony N., Ltd.*, 764 S.W.2d 874, 885 (Tex. App.—Austin 1989, writ denied) ("A party on appeal may not complain of errors which do not injuriously affect him or which merely affect the rights of others."). To argue that another party received better treatment than Sister Initiative does not answer the question of whether the portion of the judgment impacting Appellants was in error.

Indeed, the argument turns on the assumption that the portion of the judgment dealing with Stonegate was correct and that the portion of the judgment against Appellants was wrong. Perhaps that argument is true, but an equally plausible assumption is that the judgment for Stonegate was wrong and that the judgment against Appellants was correct. Either assumption lacks the focus needed to establish Appellants' burden—that the trial court's determinations involving Appellants lacked evidentiary support or were an erroneous application of the law. Accordingly, we overrule Appellants' issue 1.2.1(b). And having overruled Appellants' subissues under issue 1.2, we hold that Section 22.230 does not insulate the Bagwells from the HOAs' claim for breach of fiduciary duty.

## C. We reject Appellants' other arguments attacking the judgment.

We have disposed of Appellants' contentions that Section 22.230 insulates them from a claim of breach of fiduciary duty. With the challenge to the underlying determination that the Bagwells breached their fiduciary duties to the HOAs gone, we unpack a series of arguments that challenge the trial court's award of damages, the equities of the award, and the bases for holding Sister Initiative jointly liable.

### 1. Unchallenged findings and conclusions of the trial court

As mentioned above, there are a number of unchallenged findings that have a direct impact on the series of questions that we deal with next:

> 87. A variety of loan structures were discussed and used, but all accomplished the same thing[—]providing cash flow to the HOAs, then to Evermore, and then to DBCo to be used for the benefit of the Bagwells and the Bagwell family business entities.
>
> 88. There was no credible evidence that the HOAs owed EMC any money.[7]

---

[7]Buried in a footnote in their reply brief as part of an argument that Crane was not an interested director, Appellants make a reference to Finding 88:

> The HOAs claim they didn't owe Evermore any money, and that this "guts" Appellants' "justification" for the loans. *E.g.*, Appellees' Br. 32–33, 53–54 (citing Finding #88 at CR781). But Appellants don't have to "justif[y]" the loans under Section 22.230. And the HOAs did owe Evermore money. See Appellants' Br. 18–19, 22 (citing evidence); *e.g.*, 11SuppRR35–38. Indeed, the HOAs settled their counterclaims against Evermore by **paying** Evermore an additional $24,000. 9SuppRR215. Thus, Finding #88 is against the great weight and preponderance of the evidence.

To the extent that Appellants rely on this reference as a challenge to Finding 88, it comes too late. *See Pineridge Assocs., L.P. v. Ridgepine, LLC*, 337 S.W.3d 461, 472 n.10

89. None of the ex-Directors contacted, or applied for a loan with, any traditional lenders or banks.

90. Mr. Bagwell attempted to encourage a potential lender to make a loan to one of the HOAs by representing that "repayment with interest is assured." In response, the potential lender declined to make a loan to the HOAs "as a vehicle for getting you cash flow," and warned Mr. Bagwell that such loans may be improper because it would appear that Mr. Bagwell "did this for purposes outside the mandate of the HOA." (Exh. 504).

91. At trial, the ex-Directors claimed that the Sister Initiative and Stonegate loans to the HOAs were extremely risky, which, allegedly, justified the short duration, high contractual and default interest rates, and the other terms set forth in the loan documents.

92. The positions taken by the ex-Directors at trial with regard to the relative risk involved in loaning the HOAs money [were] contradicted by representations made by the Bagwells to potential lenders.

. . . .

94. The Bagwells intended to use Sister Initiative and Stonegate money, ~~putatively loaned to the HOAs~~ [initialed in the margin with trial judge's initials], to continue to fund the Bagwell family business entities and pay for certain personal expenses of the Bagwells, including grocery bills and other household bills.

95. As a part of the Bagwells' plan to use Sister Initiative and Stonegate money to benefit themselves and the Bagwell family business entities, the Bagwells determined that it would be in their best interest to cause the Sister Initiative and Stonegate money to flow through the HOAs in order to create the semblance of loans to the HOAs, which would then allow Sister Initiative and Stonegate to sue the HOAs to recover the putative loan proceeds plus interest and attorney's fees,

(Tex. App.—Fort Worth 2011, no pet.) (holding that an appellant waives consideration of a contention raised for the first time in a reply brief).

43

knowing that such loans were secured by liens on future assessments owed to the HOAs by property owners.

96. The Bagwells caused Sister Initiative, and Crane caused Stonegate, to bring this lawsuit against the HOAs in order to collect debts allegedly owed by the HOAs to Sister Initiative and Stonegate as a result of multiple ~~putative~~ [initialed with trial judge's initials] loan agreements between Sister Initiative and Stonegate, as lenders, and the HOAs, as borrowers, that were allegedly entered into during the time the ex-Directors served as officers and directors of the HOAs.

. . . .

115. To the extent money was transferred from Sister Initiative to any of the HOAs, the Bagwells did not intend that money to be used for the benefit of the HOAs but, at all times relevant, intended that money to further the personal and business interests of the Bagwells and the Bagwell family business entities, at the expense or to the detriment of the HOAs.

. . . .

118. All of the loans in question were the product of self-dealing by the Bagwells, and each of the Bagwells benefitted, either directly or indirectly, from each and every loan at issue.

119. During the time the Bagwells served as officers and directors of the HOAs, the Bagwells failed as follows:

a. to make reasonable use of the confidence that was placed in them by each of the HOAs;

b. to act in the utmost good faith toward the HOAs;

c. to exercise the most scrupulous honesty toward the HOAs; and

d. to place the interests of the HOAs before their own interests.

120. During the time the Bagwells served as officers and directors of the HOAs, the Bagwells[] used the advantage of their positions as

officers and directors of the HOAs to gain benefits for themselves at the expense of the HOAs.

121. The Bagwells intentionally and/or recklessly placed themselves in a position in which their self-interest conflicted with the fiduciary duties that each of them owed to the HOAs.

122. The Bagwells engaged in self-dealing in their control and use of EMC and Sister Initiative in order to gain possession of the HOAs' cash.

123. David and Susan Bagwell's breaches of fiduciary duty were intentional and designed to injure the HOAs or obtain an undue and unconscientious advantage in favor of the Bagwells, including the Bagwell family business entities.

124. At all relevant times the Bagwells and Sister Initiative:

a. All had knowledge of the plan to wrongfully divert cash of the HOAs to the Bagwells and Bagwell family business entities;

b. All intended and agreed to wrongfully divert cash of the HOAs to the Bagwells and Bagwell family business entities; and

c. All participated in the wrongful diversion of cash of the HOAs to the Bagwells and Bagwell family business entities.[8]

125. The conduct of the Bagwells in the wrongful diversion of cash of the HOAs to themselves and Bagwell family business entities injured the HOAs.

---

[8]The only reference to this finding in Appellants' opening brief is the following statement: "Because the findings and judgment related to a breach of fiduciary duty should be reversed (see Sections 1.2 & 1.3, above), the findings and judgment related to conspiracy and to aiding and abetting have nothing to stand on and must likewise be reversed."

## 2. We reject Appellants' argument that the HOAs suffered no harm.

In the first of their alternative attacks, set forth in issue 1.3.1, Appellants contend that the HOAs suffered no "harm" and cannot recover any damages. As we understand this argument, its premise is that the Bagwells testified that the HOAs needed money, that the HOAs could not obtain loans from other sources, and that the loans from Sister Initiative were simply a substitution for the loans sought from third-party lenders. But that explanation does not answer or even form the basis for the attack on the theory set out in the numerous findings that are set forth above: the Bagwells used the HOAs as a conduit to move money from Sister Initiative to themselves and left the HOAs on the line to repay those loans. Simply supplying a motive for seeking loans from Sister Initiative does not demonstrate how the trial court erred by finding that those loans were misused.

To ensure that we have accurately portrayed the argument made by Appellants, we quote their argument:

> Put another way: the only findings that can possibly support the judgment are the findings related to an alleged breach of fiduciary duty as it pertains to Sister Initiative's loans. The HOAs cannot rely on any other alleged breach or misconduct—or on the trial court's findings of any other breach or misconduct—not only because they waived those arguments . . . but also because there is no evidence or finding that can establish a causal connection between the damages actually awarded and any other alleged breach or misconduct. See [*Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018)] (claim for breach of fiduciary duty requires showing that damages were proximately caused by breach); *Fortune* [*Prod.*] *Co. v. Conoco, Inc.*, 52 S.W.3d 671, 681–[82] (Tex. 2000) (damages award will be reversed when evidence doesn't support amount awarded).

46

Moreover, even the findings related to an alleged breach of fiduciary duty as it pertains to Sister Initiative's loans are insufficient to support the judgment, because there is no evidence—or there is insufficient evidence—to establish a causal connection between the alleged breach related to the loans and the damages amounts actually awarded.

It is undisputed that the HOAs were financially distressed and needed money to pay overdue bills. It is indisputable that David Bagwell tried but could not find financing from other lenders. It is indisputable that Sister Initiative transferred money to the HOAs with the expectation of repayment, and that the HOAs accepted this money with the intent to repay it. (In other words, it is indisputable that there were—at the very least—oral agreements that Sister Initiative would make loans to the HOAs.) And it is further indisputable that the HOAs used this loan money to pay their overdue bills—bills that the HOAs were indisputably obligated to pay. It is therefore indisputable that the HOAs benefitted [sic] from Sister Initiative's loans, insofar as they were able to use the loan money to pay bills that they were indisputably obligated to pay. And it is further undisputed that the HOAs began to repay these loans to Sister Initiative.

*There is simply no legal basis for construing these agreed[-]upon repayments of borrowed money as "harm" or "damages" that are recoverable on a breach-of-fiduciary-duty claim. Had David Bagwell secured financing from some other lender—without any colorable claim of a breach of fiduciary duty—the HOAs would've been in exactly the same boat: borrowing money to pay their overdue bills, then repaying that borrowed money to the lender. Indeed, this is precisely what the HOAs were doing with Stonegate: borrowing money to pay their overdue bills, then repaying that borrowed money to Stonegate. If the HOAs made similar repayments of borrowed money to Stonegate—and would've made similar repayments of borrowed money to any other lender—then the HOAs' repayments of borrowed money to Sister Initiative cannot be construed as a "harm" that resulted from any alleged misconduct.* [Emphasis added.] [Footnotes omitted.]

The only record citations given for this argument are to ten pages of the record that set out testimony by the Bagwells and their accountant that they had tried to obtain

47

loans from other sources but could not do so and that the money received went to Evermore to pay legitimate bills.[9]

Nothing in Appellants' argument tells us how the standards of review that govern our review of the trial court's fact findings show that the findings that we have outlined are wrong nor does the argument even mention those findings. The argument turns mostly on the theory that the loans must have had a legitimate basis because the Bagwells had been turned down for loans by third-party lenders—a fact that does not rebut the claims that the loan proceeds that were obtained were misused. We have reproduced the snippet of testimony cited that the loans went to pay past-due bills. But the HOAs cite us to portions of the record where Susan acknowledged instructions about the use of the monies from the Sister Initiative loans that showed the monies were to be used to make payments on personal credit cards, household bills, loans made to family members, and health insurance. It is not within our purview to reweigh the evidence. We therefore overrule Appellants' issue 1.3.1.

**3. We reject Appellants' argument that the judgment is in error because the Bagwells did not receive a "benefit" from the loans.**

Within issue 1.3.2, Appellants acknowledge that the HOAs pleaded for forfeiture and that case law establishes that "a plaintiff can succeed on a breach-of-fiduciary-duty claim without proving 'harm,' if she can prove that the defendant obtained a 'benefit' from the breach" and cite *First United Pentecostal Church of Beaumont*

---

[9]One of the citations is to the Bagwells' accountant's testimony, which is set forth in footnote 6, *supra.*

48

*v. Parker* for that proposition. 514 S.W.3d 214, 220–21 (Tex. 2017). But after making these acknowledgements, Appellants try to draw their sting by arguing that the HOAs' forfeiture claim should not apply because there is no evidence that any benefit the Bagwells received matched the amount that the trial court awarded as damages:

> In this case, the HOAs did plead forfeiture as a possible remedy. But the HOAs' claim for breach of fiduciary duty is against David and Susan Bagwell, personally, as directors of the HOAs—**not** against Sister Initiative, which undisputedly owed no fiduciary duty to the HOAs. And it was Sister Initiative—**not** David Bagwell or Susan Bagwell—who received the HOAs' repayments on the loans. *To the extent that David or Susan Bagwell (the subjects of the HOAs' breach-of-fiduciary-duty claim) ever personally received a "benefit" from Sister Initiative's loans, there is no evidence that they received any amount even remotely resembling the amounts awarded to the HOAs as "damages." So—even if the trial court's damages award could be construed as a forfeiture award, based on an alleged benefit received by the Bagwells—there is no evidence to support the amounts awarded as forfeiture.* [Emphasis in italics added.] [Footnotes omitted.]

We have quoted the unchallenged findings that chart the trial court's determinations that the Bagwells used the loans from Sister Initiative as a way to funnel money to themselves. Thus, the findings establish, and it appears that Appellants' brief concedes, the existence of some benefit to the Bagwells.

The Bagwells' argument appears to be that there must be some mathematical relationship between the amount of their benefit and the amount forfeited. The Bagwells do not suggest what this proportion should be and do not provide any calculations to establish the disproportion of the benefit that they claim to have received and the amount of the forfeiture. The Bagwells also cite no authority for the proposition that a forfeiture recovery depends solely on a proportionate relationship

49

between the benefit received and the amount forfeited. Such a principle is at odds with the very concept of forfeiture or disgorgement that does not depend on proof of damages. *See generally Swinnea v. ERI Consulting Eng'rs, Inc.*, 481 S.W.3d 747, 753 (Tex. App.—Tyler 2016, no pet.) (stating that "unlike an award of exemplary damages, actual damages are not a prerequisite for disgorgement of contractual consideration").

A case that the Bagwells cite highlights this principle:

> First, in principle, a person in a trust relationship who does not provide the loyalty bargained for fails to fulfill his agreement and is not entitled to be paid in full. Therefore, when considering an appropriate remedy for a fiduciary's breach of loyalty, the "agent's breach of fiduciary duty should be deterred even when the principal is not damaged." [*Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999)]. "It is the agent's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation." *Id.* at 238. Pragmatically, fee forfeiture also serves as a deterrent. The central purpose of this remedy "is not to compensate an injured principal, even though it may have that effect." *Id.* "Rather, the central purpose of the equitable remedy of forfeiture is to protect relationships of trust by discouraging agents' disloyalty." *Id.*

*Parker*, 514 S.W.3d at 221.

A host of factors guide the trial court's determination of whether a forfeiture should be imposed and its amount. The Dallas Court of Appeals recently explained the involved and discretion-laden process that underlies a trial court's forfeiture determination:

> As stated above, the trial court's first step is to determine whether there was a "clear and serious" breach of duty. *See Swinnea*, 481 S.W.3d at 753; *Dernick*[ *Res., Inc. v. Wilstein*], 471 S.W.3d [468,] 482 [(Tex. App.—Houston [1st Dist.] 2015, pet. denied)]. The trial court should consider factors such as: (1) the gravity and timing of the breach; (2) the level of

50

intent or fault; (3) whether the principal received any benefit from the fiduciary despite the breach; (4) the centrality of the breach to the scope of the fiduciary relationship; (5) any other threatened or actual harm to the principal; (6) the adequacy of other remedies; and (7) whether forfeiture fits the circumstances and will work to serve the ultimate goal of protecting relationships of trust. *See ERI Consulting*[ *Eng'rs, Inc. v. Swinnea*], 318 S.W.3d [867,] 875 [(Tex. 2010)]; *Swinnea*, 481 S.W.3d at 753; *Dernick*, 471 S.W.3d at 482. However, forfeiture is not justified in every instance in which a fiduciary violates a legal duty because some violations are inadvertent or do not significantly harm the principal. *See Burrow*, 997 S.W.2d at 241; *Dernick*, 471 S.W.3d at 482; *Miller* [*v. Kennedy & Minshew Prof'l Corp.*], 142 S.W.3d [325,] 338 [(Tex. App.—Fort Worth 2003, pet. denied)].

Second, the trial court must determine whether any monetary sum should be forfeited. The central purpose of forfeiture as an equitable remedy is not to compensate the injured principal[] but to protect relationships of trust by discouraging disloyalty. *See In re Longview* [*Energy Co.*], 464 S.W.3d [353,] 361 (Tex. 2015) (orig. proceeding); *ERI Consulting*, 318 S.W.3d at 872–73; *Burrow*, 997 S.W.2d at 238; *see also Dernick*, 471 S.W.3d at 482. Disgorgement is compensatory in the same sense as attorney fees, interest, and costs, but it is not damages. *See In re Longview*, 464 S.W.3d at 361. As a result, equitable forfeiture is distinguishable from an award of actual damages incurred as a result of a breach of fiduciary duty. *See Burrow*, 997 S.W.2d at 240; *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 905 (Tex. App.—Dallas 2014, pet. denied); [*see also*] *Swinnea*, 481 S.W.3d at 753. In fact, a claimant need not prove actual damages to succeed on a claim for forfeiture because they address different wrongs. *See Burrow*, 997 S.W.2d at 240; *Swinnea*, 481 S.W.3d at 753. In addition to serving as a deterrent, forfeiture can serve as restitution to a principal who did not receive the benefit of the bargain due to his agent's breach of fiduciary duty. *See Swinnea*, 481 S.W.3d at 753 (citing *Burrow*, 997 S.W.2d at 237–38).

Third, if the trial court determines there should be a forfeiture, it must determine what the amount should be. The amount of disgorgement is based on the circumstances and is within the trial court's discretion. *See McCullough*, 435 S.W.3d at 905; *Swinnea*, 481 S.W.3d at 753. For example, it would be inequitable for an agent who performed extensive services faithfully to be denied all compensation if the

misconduct was slight or inadvertent. *See McCullough*, 435 S.W.3d at 905 (citing *Burrow*, 997 S.W.2d at 241).

*Cooper v. Campbell*, No. 05-15-00340-CV, 2016 WL 4487924, at \*10–11 (Tex. App.—Dallas Aug. 24, 2016, no pet.) (mem. op.).

The Bagwells do not reference or apply any of the factors that the Dallas Court of Appeals outlined, based on established case law, to guide the analysis of the determination of whether a forfeiture is warranted and what the amount of that forfeiture should be. Nor do they tie these factors to the findings that they have not challenged or even referenced. Instead, their focus is simply that the amounts forfeited are disproportionate to the "benefits" they received, but they give us no guidance why that is true. And finally, their argument appears to have a premise that proportionality must be established between the benefit they received and the amount forfeited—a principle that does not appear to be controlling to the extent it is even a factor. An attack that focuses on this narrow factor—in light of the many factors that control the trial court's decision to make a forfeiture and to decide what the amount of the forfeiture should be—does not convince us that the trial court abused its discretion by making its forfeiture award. We overrule Appellants' issue 1.3.2.

### 4. We reject Appellants' argument that Sister Initiative should not be held jointly liable.

Sister Initiative, in a single paragraph included as issue 1.4, argues that it should not be held jointly liable with the Bagwells. The extent of Sister Initiative's argument is as follows:

52

> Without an underlying counterclaim against the Bagwells for breach of fiduciary duty . . . , there is no basis for the HOAs' counterclaims against Sister Initiative for conspiracy or aiding and abetting. *See Agar Corp.*[] *v. Electro Circuits* [*Int'l*]*, LLC*, [580 S.W.3d 136, 142 (Tex. 2019)] (conspiracy is not an independent tort); [*Parker*], 514 S.W.3d at 224 (aiding and abetting has not been recognized as an independent cause of action). Because the findings and judgment related to a breach of fiduciary duty should be reversed . . . , the findings and judgment related to conspiracy and to aiding and abetting have nothing to stand on and must likewise be reversed.

The argument references the trial court's finding that is the basis for holding Sister Initiative liable but raises no challenge to it other than the one quoted. The finding at issue is as follows:

> 124. At all relevant times the Bagwells and Sister Initiative:
>
> a. All had knowledge of the plan to wrongfully divert cash of the HOAs to the Bagwells and Bagwell family business entities;
>
> b. All intended and agreed to wrongfully divert cash of the HOAs to the Bagwells and Bagwell family business entities; and
>
> c. All participated in the wrongful diversion of cash of the HOAs to the Bagwells and Bagwell family business entities.

We have rejected Appellants' challenges based on Section 22.230 of the Business Organizations Code and on the alleged inequity of the trial court's forfeiture award. Those holdings alone warrant overruling Sister Initiative's joint-liability argument.

However, to the extent that one may read Sister Initiative's argument as a challenge to the existence of a claim for aiding and abetting, we do not read the case cited by Sister Initiative as broadly as it does. The Texas Supreme Court in *Parker* did not categorically hold that aiding and abetting has not been recognized as a cause of

53

action. Instead, the Texas Supreme Court noted only that "this Court has not expressly decided whether Texas recognizes a cause of action for aiding and abetting." *Parker*, 514 S.W.3d at 224.

Other courts have noted that Texas recognizes a cause of action for knowing participation in a breach of fiduciary duty:

> Texas appellate courts have repeatedly held that "a party who knowingly participates in another's breach of fiduciary duty may be liable for the breach as a joint tortfeasor." *Westergren v. Jennings*, 441 S.W.3d 670, 680 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 574 (Tex. 1942)); *see also Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.) (same). "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing [ ] *Cox Tex*[.] *Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex. App.—Austin 2001, pet. denied)).

*Milligan, Tr. for Westech Capital Corp. v. Salamone*, No. 1:18-CV-327-RP, 2019 WL 1208999, at *9 (W.D. Tex. Mar. 14, 2019) (order). Sister Initiative does not offer any reason why the finding quoted above and the others made by the trial court would not meet the elements reiterated by *Milligan*.

With respect to civil conspiracy, Sister Initiative is correct that conspiracy is not a tort in and of itself. However, the trial court's conclusion of law dealing with conspiracy does not suggest that it is: "7. The Bagwells and Sister Initiative engaged in a conspiracy to commit unlawful acts against the HOAs and/or used unlawful

54

means to accomplish a lawful objective."   Again, the basis for Sister Initiative's argument is that there cannot be liability for an underlying breach of fiduciary duty. We have held that there is.  Accordingly, we overrule Sister Initiative's issue 1.4.[10]

---

[10]In their reply brief, Appellants argue that the multiple corporate entities involved in the loans served as a shield to Sister Initiative and demonstrate why it should recover on the loans because it was so detached from the actions of the Bagwells.  This argument takes two forms; first, as set forth in Appellants' reply brief, is that any benefit to the Bagwells is not a benefit to Sister Initiative:

> But the HOAs can cite **no evidence** that any of the money that they paid back to Sister Initiative was passed to David or Susan Bagwell.  In other words, there is **no evidence** that the amounts paid back to Sister Initiative correspond with a "benefit" to David or Susan Bagwell.  The HOAs claim (again and again) that "the Bagwells" were "funneling" money "into their own pockets."  But they cite **no evidence** and obtained **no finding** that enables them to disregard corporate forms and equate money paid back to Sister Initiative with money paid to "the Bagwells."

The second shade of the argument is made in support of Appellants' windfall argument:

> Sister Initiative is a separate legal entity, owned by Brooke Krueger and Meredith Matlock (the adult daughters of David and Susan Bagwell).  It is undisputed that Sister Initiative's loan money originated from Krueger and Matlock, as money they inherited from their grandmother.  Sister Initiative and its owners (Krueger and Matlock) have every right to recover the inherited money that they loaned to the HOAs, regardless of whether the HOAs spent it—and even if the HOAs spent it in a way that put some of that money into David and Susan Bagwell's pockets.  This is just how the flow of money works.  Sister Initiative and its owners (Krueger and Matlock) are **separate legal entities**—and they are no less entitled to recover their money from the HOAs than any other lender who lends money.  [Footnotes omitted.]

But these arguments disregard the findings that tied Sister Initiative to the breaches of duty committed by the Bagwells.  As such, we reject them.

**5. We reject Appellants' argument that the consideration for the loans should be returned by the HOAs.**

Appellants argue in issue 1.3.3 that the trial court erred by permitting the HOAs to receive a "windfall" by not ordering them to repay the loan funds that they had received but not yet repaid. Analogizing the situation to rescission of a contract, they argue that the trial court could not enter an order that was tantamount to rescission by voiding the loans and not return the parties to the status quo ante by ordering return of the consideration they passed to the HOAs in performance of the contract. In Appellants' view, "in voiding a loan agreement, the parties should be returned to their status before the loan was made—*i.e.*, the borrower does **not** get to simply keep the borrowed money."

Once again, Appellants offer an equitable argument that relies solely on their view of equity. Their argument cites a general rule but does not acknowledge that a contract may be rescinded without requiring the return of consideration. They simply ignore the findings and conclusions that recognize the equities contrary to the ones dictated by their perspective.[11]

---

[11]As part of their argument, Appellants argue that "[e]ven in a usury case, where there are stiff statutory penalties imposed on unfair loans, those penalties do not include allowing the borrower to simply keep all the borrowed money as a windfall." They support this argument by citing Section 349.001 of the Finance Code that allows for penalties only when the amount of interest charged does not exceed twice the amount authorized. *See* Tex. Fin. Code Ann. § 349.001. But they ignore the following section of the Finance Code that deals with charging interest in twice the amount authorized by the Finance Code and that permits what is in essence a forfeiture by

Appellants' argument relies on the supreme court's opinion in *Texas Co. v. State* and its holding "that one seeking a cancellation of an instrument, with certain exceptions not pertinent here, must restore the original status; he cannot repudiate the instrument and retain the benefits received thereunder." 281 S.W.2d 83, 91 (Tex. 1955). But this bare citation ignores the numerous cases that articulate the exceptions that *Texas Co.* alluded to. For example,

> [a] recognized exception to this rule is that rescission may be allowed without complete or partial restoration of the consideration where the particular circumstances indicate that to be the more equitable result, as where a defrauded party's inability to make restoration is due to the wrongful conduct of the fraudulent party.

*Turner v. Hous. Agric. Credit Corp.*, 601 S.W.2d 61, 65 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.); *see also Shenandoah Assocs. v. J & K Props., Inc.*, 741 S.W.2d 470, 476 (Tex. App.—Dallas 1987, writ denied) (stating that a recognized exception to the rule requiring restoration of the parties to their original status "is when the purchaser terminates the contract and the court has examined the circumstances and determined that it would be more equitable to grant the rescission without the complete or partial restoration of the consideration received by the purchaser while in possession of the purchased item"); *Boyter v. MCR Constr. Co.*, 673 S.W.2d 938, 941 (Tex. App.—Dallas

---

making the person charging that interest "liable to the obligor as an additional penalty for all principal or principal balance, as well as all interest or time price differential." *See id.* § 349.002(a). Thus, the analogy that Appellants draw fails because even the statutory scheme Appellants rely on permits what is tantamount to forfeiture in some circumstances.

1984, writ ref'd n.r.e.) (stating that to be entitled to the equitable remedy of rescission, "a party must show either (1) that he and the other party are in the status quo . . . or (2) that there are special equitable considerations that obviate the need for the parties to be in the status quo"). Moreover, Restatement (Third) of Restitution and Unjust Enrichment states,

> (3) Rescission is limited to cases in which counter-restitution by the claimant will restore the defendant to the status quo ante, unless
>
>> (a) the defendant is fairly compensated for any deficiencies in the restoration made by the claimant, or
>>
>> (b) the fault of the defendant or the assignment of risks in the underlying transaction makes it equitable that the defendant bear any uncompensated loss.
>
> (4) Rescission is appropriate when the interests of justice are served by allowing the claimant to reverse the challenged transaction instead of enforcing it. As a general rule:
>
>> (a) If the claimant seeks to reverse a transfer induced by fraud or other conscious wrongdoing, the limitation described in subsection (3) is liberally construed in favor of the claimant.

Restatement (Third) of Restitution and Unjust Enrichment § 54 (Am. Law Inst. 2011). And, as discussed above, a trial court has broad discretion to fashion the remedy of forfeiture when it has found a breach of fiduciary duty. *Cooper*, 2016 WL 4487924, at *10–11. The purpose of that forfeiture remedy goes beyond compensating the injured principal and is designed to punish disloyalty. *Id.*

Again, we note the unchallenged findings that we have catalogued that underlie the trial court's finding that the loans made by Sister Initiative constituted a diversion

58

of funds from the HOAs to the Bagwells. The trial court balanced the equities in this case by ordering that all the Sister Initiative notes were "void and unenforceable." It was within the discretion of the trial court to decide whether it would enforce the instruments that it apparently viewed as the vehicle by which the Bagwells aided and abetted or in conspiracy with Sister Initiative used to breach their fiduciary duty. We therefore overrule Appellants' issue 1.3.3.

### 6. Appellants' arguments regarding immaterial findings

Appellants assert in issue 1.5 that the trial court made findings that were inappropriate and that we should set aside those findings. In Appellants' words, the allegedly inappropriate findings do not have "anything to do with the trial court's final judgment." Somewhat buried in this argument is the statement that certain findings should be set aside because they are not supported by the record. The authorities we cite below provide two reasons to reject Appellants' argument. First, if Appellants wish to contend that there are findings that are not supported by the record, it is their duty to specifically identify those findings and to make citations to the record establishing why the finding is not supported—by not doing so, Appellants have waived any claim of error. Second, the fact that a trial court makes findings that are immaterial is harmless; the question is not whether the trial court made immaterial findings but whether the findings that it did make support the judgment.

Appellants make the statement that the findings that they reference "should be set aside as unsupported by the evidence." This statement—without elaboration—

imposes no duty on us to review the entire record to determine whether the findings are supported by evidence. An appellant's failure to cite legal authority to or provide substantive analysis of a legal issue presented results in waiver of the appellant's complaint. *Flores v. James Wood Fin. LLC*, No. 02-13-00022-CV, 2013 WL 3064455, at *1 (Tex. App.—Fort Worth June 20, 2013, no pet.) (mem. op.) (citing *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994), which recognizes long-standing rule that error may be waived due to inadequate briefing). We have no duty to perform an independent review of the record and applicable law to determine whether the purported error of which a party complains occurred. *See Karen Corp. v. Burlington N. & Santa Fe Ry. Co.*, 107 S.W.3d 118, 125 (Tex. App.—Fort Worth 2003, pet. denied).

Next, the fact that the trial court may have made immaterial findings is not an issue that impacts the resolution of this appeal. Our review focuses on whether the trial court erred by making findings that were necessary to support the judgment. The fact that it made findings on immaterial issues—findings that did not impact the judgment—does not constitute harmful error:

> While an erroneous finding of fact on an ultimate fact issue is harmful error, an immaterial finding of fact is harmless and not grounds for reversal. *Andrews v. Key*, 13 S.W. 640, 641 (Tex. 1890); *Cooke [Cty.] Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.); *see also Able v. Able*, 725 S.W.2d 778, 780 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). An ultimate fact issue, which a trial court is required to enter in its requested written findings of fact following a bench trial, is one that is essential to the cause of action and has a direct effect on the judgment. *In re Marriage of Edwards*, 79

60

S.W.3d 88, 94 (Tex. App.—Texarkana 2002, no pet.). An evidentiary issue, which a trial court is not required to enter in its requested written findings of fact following a bench trial, is one the court may consider in deciding the controlling issue, but is not controlling in itself. *Id.*

*RH White Oak, L.L.C. v. Lone Star Bank*, No. 14-16-00840-CV, 2018 WL 4925118, at *7 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018, pet. granted, judgm't vacated w.r.m.) (mem. op.). Appellants do not tell us why we should search the record to scrub out "inappropriate findings" if those findings create only harmless error. We therefore overrule Appellants' issue 1.5.

### 7. We reject Appellants' argument that the HOAs waived any alternative ground for upholding the trial court's judgment.

In issue 1.1, Appellants argue that the HOAs waived any alternative ground for upholding the trial court's judgment by declining to challenge the trial court's damages award. Appellants contend that "[i]f the HOAs actually believed their exaggerated accusations of widespread misconduct—if they actually believed that they had any colorable claim to over $2.3 million in damages—then they had every reason to complain about the trial court's damages awards." Appellants further contend that "[b]y choosing not to complain about the substantial discrepancy between the damages they sought (over $2.3 million) and the damages they were actually awarded (less than $20,000 each), the HOAs revealed that their exaggerated accusations of widespread corruption were just a strategic distraction to avoid repaying Sister Initiative's loans." Appellants' contentions do not challenge any of the trial court's findings, nor do they undermine our prior holdings. As such, the arguments raised in

Appellants' issue 1.1 about the HOAs' failure to challenge the damages award do not entitle Appellants to any relief. Accordingly, we overrule Appellants' issue 1.1.

## D. We overrule Appellants' first issue.

We have considered and disposed of each of Appellants' arguments supporting their first issue that the trial court erred by voiding the Sister Initiative loans and awarding the HOAs compensation. We therefore overrule Appellants' first issue in its entirety.

## V. Analysis of Appellants' Second Issue

In their second issue, Appellants argue that the trial court erred by not rendering judgment that Sister Initiative recover on its loans, either on the basis that the HOAs breached the loan agreements or that Appellants should recover on the cause of action for money had and received. We reject both arguments.

Appellants first argue in issue 2.1 that

[b]ecause the written (or oral) loan agreements are valid and enforceable . . . , and because it is indisputable that the HOAs breached the loan agreements by refusing to repay the loans, the Court should reverse the judgment below and render judgment in favor of Sister Initiative and the Bagwells, holding the HOAs should take nothing on their counterclaims and Sister Initiative is entitled to recover the outstanding balance of the loans, with the agreed-upon interest, plus costs and attorneys' fees.

We have held above that the trial court did not err by concluding that the loan agreements are not valid and enforceable. This holding disposes of the quoted argument and, thus, we overrule Appellants' issue 2.1.

62

Next, Appellants make their final attack on the trial court's judgment by claiming in issue 2.2 that the trial court erred by denying their claim for money had and received. They claim that should we conclude that the loan agreements are not in writing, then their claims fit into an equitable claim for money had and received. In their words, "this action applies perfectly here, if the Court determines that Sister Initiative's loans are 'not evidenced by a writing.'" Having offered this legal entrée into the cause of action, Appellants reurge their argument that the HOAs will have a windfall if they are not required to repay the loans and that

> [t]he HOAs have engaged in ethically questionable behavior—adopting a "shock and awe" strategy of overwhelming distraction and defamation to transform this simple case about small loans into an "ugly and complex" case about exaggerated accusations of widespread corruption—all in an effort to avoid the repayment of the loans.

Because the trial court did not adopt this view, Appellants argue that the trial court's "findings and judgment to the contrary . . . are arbitrary, unreasonable, and unsupported by guiding rules and principles."

We reject the claim for money had and received because Appellants did not plead a claim for money had and received based on *oral* loans. And the argument, once again, ignores the findings and conclusions quoted above that establish that the Bagwells breached their fiduciary duty to the HOAs and that Sister Initiative conspired to accomplish that breach or aided and abetted it.

A claim for money had and received is a nebulous cause of action that turns on the question of whether a party holds the money that in equity and good conscience

belongs to another and is designed to avoid the unjust enrichment of a party being permitted to hold money that justly belongs to another. *See generally Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015) (explaining that for a money-had-and-received claim, a plaintiff must show that a defendant holds money that in equity and good conscience belongs to the plaintiff, and thus, it is an equitable doctrine applied to prevent unjust enrichment). The history and principles underlying this cause of action were described by the Dallas Court of Appeals as follows:

> According to legal historians, assumpsit was developed to redress circumstances involving unjust enrichment or an implied promise to pay what in good conscience [the] defendant was bound to pay the plaintiff. Over time, assumpsit was divided into various categories. Money had and received is a category of general assumpsit to restore money where equity and good conscience require refund. "The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him." A cause of action for money had and received is "less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money which . . . belongs to the plaintiff."
>
> A cause of action for money had and received is not premised on wrongdoing, but "looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." Such an action may be maintained to prevent unjust enrichment when a party obtains money which in equity and good conscience belongs to another. In short, it is an equitable doctrine applied to prevent unjust enrichment.

*MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 813 (Tex. App.—Dallas 2012, no pet.) (citation omitted).

But the claim for unjust enrichment that is the basis for the cause of action for money had and received is a quasi-contractual claim. *See Villages of Sanger, Ltd. v. Interstate 35/Chisam Rd., L.P.*, No. 05-16-00366-CV, 2018 WL 703327, at *6 (Tex. App.—Dallas Feb. 5, 2018, no pet.) (mem. op.) ("Likewise, a cause of action for money had and received is equitable in nature. The claim belongs conceptually to the doctrine of unjust enrichment." (citations and quotation marks omitted)). When an express written agreement "covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory . . . because parties should be bound by their express agreements[, and] [w]hen a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Fortune Prod. Co.*, 52 S.W.3d at 684.

The cause of action for money had and received pleaded by Sister Initiative claimed that the HOAs had failed to perform their *written* contract in the form of the loan agreements. Specifically, their petition alleges,

> As stated above, the Loan Documents require the Borrowers to pay back the outstanding loan amounts upon availability of funds. *See* Exhibits "B" – "G." Upon information and belief, the Borrowers have received assessments and other income since the default of the loans[] but have not used that revenue to fulfill their obligations to the Lenders. The Borrowers are holding money that, in equity and good conscience, belongs to the Lenders.

Also, we find no request for findings or conclusions that rely on a money-had-and-received claim that is based on an oral contract.

65

Appellants do not explain how they could maintain a quasi-contractual claim when that claim is predicated on an express written loan document and the existence of that written loan agreement is inconsistent with the quasi-contractual claim. Their brief silently side steps these impediments by arguing that the money-had-and-received claim is a perfect fit for a claim that the loan agreements were oral. But at trial, they fought vigorously to maintain their position that the loan agreements were written and continue to do so in their brief. Their brief shifts to a claim based on oral agreements as a back-up argument should we conclude that there is evidence that invalidates the existence of written agreements. But they point to no pleading asserting a claim for breach of oral loan agreements or making a money had and received claim that relied on oral loan agreements. Appellants cannot sustain a judgment based on such a claim without pleading it or establishing that it was tried by consent. *See* Tex. R. Civ. P. 301; *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 546 (Tex. 2003) (stating that judgment cannot be sustained based on unpleaded claim).

Delving further into Appellants' argument, we conclude that the trial court did not abuse its discretion by denying their money-had-and-received claim. Overall, an appellate court "will not disturb a trial court's ruling on a claim seeking equitable relief unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles." *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied). And as we have noted, the trial court "exercises broad discretion in balancing the equities involved in a case seeking equitable relief." *Id.* The findings

made in a nonjury trial are an integral part of the process of testing the broad exercise of discretion:

> When a trial court makes written findings of fact following a non-jury trial, these assist in our review of the trial court's exercise of its discretion by revealing the trial court's reasoning and analysis and help assure both the reviewing court and the litigants that the trial court's decision resulted from thoughtful deliberation. If the evidence is sufficient to support the trial court's findings and conclusions, the trial court did not abuse its discretion.

*Id.* (citations omitted). We have catalogued the trial court's findings above, many of which are unchallenged and undermine Appellants' plea that they should receive equity.

Also, in their argument challenging the denial of their claim for money had and received, Appellants take the same broad-brush approach that characterizes their prior attacks on the trial court's exercise of its discretion. They begin with the same premise as their prior arguments that the HOAs' retention of the loan proceeds is a windfall and then transition to a criticism of the HOAs' "shock and awe" trial tactics that were, in their view, an effort to avoid repayment of the loans. From this, they conclude that "[t]he trial court's findings and judgment to the contrary are arbitrary, unreasonable, and unsupported by guiding rules and principles. This is particularly apparent, given the trial court's inconsistent ruling in Stonegate's favor." [Footnote and citation omitted.]

Again, the argument skirts the findings that we quoted above and never comes to grips with whether those findings have support in the evidence nor makes any

argument why those findings would not support the exercise of the trial court's discretion in balancing the equities against them. It is not our job to make arguments for the parties. *See Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105, 128 (Tex. App.—El Paso 2018, no pet.) (stating that "[i]f we must speculate as to the nature of a party's argument and stray too far into independent research ourselves in order to resolve an issue, then the issue has not been adequately briefed" and that "we should decline to address it, if not for fear of inadvertently becoming an advocate for the party, then at least for claims-processing purposes as the Court prioritizes its finite judicial resources in the service of arguments and debates that do not leave us guessing.").

The unchallenged findings provide reassurance that the trial court did not abuse its discretion. For example, the trial court concluded that Sister Initiative acted with unclean hands. The Fourteenth Court of Appeals set the parameters of when to apply the unclean-hands doctrine as follows:

> The doctrine will be applied only to "one whose own conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing." In addition, the complaining party must show an injury to himself arising from the conduct. "The clean hands maxim should not be applied when the defendants have not been seriously harmed and the wrong complained of can be corrected without applying the doctrine."

*In re Jim Walter Homes, Inc.*, 207 S.W.3d 888, 899 (Tex. App.—Houston [14th Dist.] 2006, orig. proceeding) (citations omitted) (citing *Thomas v. McNair*, 882 S.W.2d 870, 880–81 (Tex. App.—Corpus Christi–Edinburg 1994, no writ)).

The trial court also entered findings—most of which are unchallenged—that the Bagwells used the loans as a vehicle for self-dealing, that their actions constituted a breach of their fiduciary duties to the HOAs, and that Sister Initiative aided and abetted and conspired in that breach. This is far beyond the situations in which courts have questioned whether the doctrine of unclean hands may not bar an equitable recovery because the party against whom the doctrine was invoked was merely negligent. *See Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 841 (5th Cir. 2004) (applying unclean-hands doctrine to claim for money had and received and noting that "the cases applying the clean hands doctrine, particularly as a defense to a claim for money had and received, are equivocal as to whether unclean hands (or what relative degree of unclean hands) bar recovery altogether" and that "Texas courts have long spoken in terms of weighing the equities, even when foreclosing recovery completely; the inquiry must thus go beyond an analysis of the plaintiff's errors of omission or commission, to balance these against the defendant's unjust acts").

The trial court's findings and conclusions in this case outline conduct that goes beyond negligence and falls into the category of being "unconscientious, unjust, or marked by a want of good faith, or [of] one who has violated the principles of equity and righteous dealing." *See Jim Walter Homes*, 207 S.W.3d at 899. In this case, to allow

Sister Initiative to recover on the loans under the doctrine of money had and received would absolve it of the conduct that the trial court found was sufficiently egregious to void the loan agreements. The argument—that it is unjust for Sister Initiative to not recover the money it loaned to the HOAs—turns a blind eye to this result and to why the nature of its conduct disqualifies it as a candidate for equity. The argument does not balance the equities but simply ignores the equities on the other side of the scale. We conclude that the trial court did not err by denying Sister Initiative's claim for money had and received, and we overrule Appellants' issue 2.2.

Having disposed of Appellants' two subissues, we overrule Appellants' second issue in its entirety.

## VI. Conclusion

Having overruled Appellants' two issues, as well as their subissues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: February 13, 2020

70

096-256351-11

CAUSE NO. 096-256351-11

| | | |
|---|---|---|
| THE STONEGATE FINANCIAL | § | IN THE DISTRICT COURT |
| CORPORATION, and SISTER | § | |
| INITIATIVE, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 96TH JUDICIAL DISTRICT |
| | § | |
| BROUGHTON MAINTENANCE | § | |
| ASSOCIATION, INC., OLD GROVE | § | |
| MAINTENANCE ASSOCIATION, INC. | § | |
| and WHITTIER HEIGHTS | § | |
| MAINTENANCE ASSOCIATION, INC., | § | |
| | § | |
| Defendants/Cross-Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| DAVID BAGWELL, SUSAN BAGWELL | § | |
| and DALE CRANE, | § | |
| | § | |
| Third-Party Defendants. | § | TARRANT COUNTY, TEXAS |

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

I.

On December 29, 2017, Sister Initiative, LLC, David Bagwell, and Susan Bagwell filed their Request for Findings of Fact and Conclusions of Law. On January 3, 2018, The Stonegate Financial Corporation filed its Request for Findings of Fact and Conclusions of Law. Such requests were filed within the time set forth in Texas Rule of Civil Procedure 296.

As set forth in the Final Judgment, the Court conducted a bench trial in the above styled and numbered case with the consent of all parties. The Court has carefully considered the

**E-MAILED**
all counsel 2-7-18

FINDINGS OF FACT AND CONCLUSIONS OF LAW                      Page 1 of 30

765

admissible evidence admitted during the trial of this case. As a part of the Court's consideration of such evidence, the Court paid careful attention to the testimony of the witnesses and carefully observed the demeanor of each witness while such witness testified. Based on the foregoing, the Court has made determinations as to the credibility of such witnesses, the weight to be given to their testimony, as well as the credibility and weight to be given to the exhibits used by the witnesses in support of their testimony. The Court has likewise made determinations concerning the credibility and weight to be given to any remaining exhibits admitted during the trial of this matter. The Court has also carefully considered the law applicable to the various claims and defenses asserted by the parties in this case.

The following findings of fact have been made by the Court following its evaluation of the admissible evidence and based upon the Court's determination that these facts have been established by a preponderance of the admissible evidence that the Court has determined to be credible. The following conclusions of law have been entered by the Court based upon its application of the applicable law to the facts the Court has determined to have been proved by the greater weight and degree of the admissible and credible evidence.

## II.
## FINDINGS OF FACT

1.      David Spurgeon Bagwell and Ella Susan Shamburger Bagwell (collectively, the "Bagwells") are lawfully married and have been married at all times relevant to this case.

2.      The Bagwells have two daughters, Meredith Carolina Bagwell Matlock and Sarah Brooke Bagwell Krueger.

3.      The Bagwells are real estate developers and investors.

4.  At all times relevant to the claims in this case, real estate development and investment was considered by the Bagwells and their daughters to be the Bagwell "family business." ~~Mr. Bagwell's current primary occupation is the pursuit and management of litigation.~~ RW

5.  A number of business entities have been formed at the behest of the Bagwells to serve the Bagwell family in conducting and sustaining the Bagwell "family business." Among the business entities which were formed at the behest of the Bagwells to conduct and sustain the Bagwell "family business" are the following:

    a.  **The David Bagwell Company:** The David Bagwell Company ("DBCo") is a for-profit company formed during the marriage of the Bagwells, owned 100% by David Bagwell, and operated exclusively by, and for the benefit of, the Bagwells. At all times relevant, David Bagwell served as President and Treasurer of DBCo, and Susan Bagwell served as Vice President and Secretary of DBCo.

    b.  **The Limited Partnerships:** Among the Bagwells' real estate developments are three neighborhoods located in Tarrant County as follows: Old Grove, Broughton, and Whittier Heights. The land whereupon these three neighborhoods are located was purchased and developed by limited partnerships formed at the behest of the Bagwells as follows: Old Grove LP, Broughton LP, and Broadland LP, respectively. The three limited partnerships were operated for a profit, and the general partner of each of the three limited partnerships is DBCo. As Manager of the general partner, David Bagwell solicited and received cash investments from third-parties in exchange for limited partnership interests in each of the limited partnerships.

767

73

c. **Evermore Corporation:** Evermore Corporation ("Evermore" or "EMC") is a for-profit company, formed during the marriage of the Bagwells, owned 100% by DBCo, and exclusively operated by the Bagwells. At all times relevant, David Bagwell served as President and Treasurer of Evermore, and Susan Bagwell served as Vice President and Secretary of Evermore.

d. **Broadacre Partners:** Broadacre Partners is a general partnership formed during the marriage of the Bagwells by David Bagwell and Dale Crane for the purpose of receiving a 49.5% "carried" or profit interest in each of the Limited Partnerships, without having invested any capital. Broadacre Partners is owned 85% by Evermore Communities, Ltd. and 15% by Dale Crane. By way of his interest in Broadacre Partners, Dale Crane had a financial interest in all of the Limited Partnerships.

e. **Evermore Communities, Ltd.:** Evermore Communities, Ltd. is a limited partnership established by David Bagwell. The sole limited partner of Evermore Communities, Ltd. is the David S. Bagwell Trust, which is managed by David Bagwell as trustee. Evermore Corporation serves as the general partner of Evermore Communities, Ltd.

f. **Sister Initiative, LLC:** Sister Initiative LLC ("Sister Initiative") is a for-profit limited liability company with two members and one manager. The two members of Sister Initiative are the two daughters of the Bagwells, Meredith Carolina Bagwell Matlock and Sarah Brooke Bagwell Krueger. Susan Bagwell served as the Manager for Sister Initiative. The purpose, mission and top priority of Sister Initiative is to support the Bagwell "family business." Sister Initiative supports

the Bagwell "family business" by making monetary investments in, or loans to, entities owned and/or controlled by the Bagwells, including DBCo, Evermore, and/or the Limited Partnerships. At all times relevant, Sister Initiative was under the complete and exclusive control of the Bagwells. Although neither a member nor manager of Sister Initiative, David Bagwell influenced and at times controlled its decisions and operations, and was an authorized signer on the Sister Initiative bank account. A significant portion of Sister Initiative's capital came from money the Bagwells' daughters inherited from their deceased grandmother.

g. The foregoing business entities are sometimes referred to hereafter as the "Bagwell 'family business' entities."

6. Dale Crane is a Harvard-educated businessman who has a commercial real estate license and has invested and consulted with David and Susan Bagwell on several development projects. Mr. Crane first met Susan Bagwell as a freshman at SMU, and later became friends and business associates with David Bagwell. Mr. Crane and the Bagwells are long-term friends and business associates.

7. **The Stonegate Financial Corporation:** The Stonegate Financial Corporation ("Stonegate") is a for-profit company that is 100% owned and operated by Dale Crane, who alone holds all corporate office positions and makes all decisions for the company. The purpose of Stonegate is to seek out investment opportunities for the financial benefit of Dale Crane.

8. The Limited Partnerships were developing the neighborhoods known as Old Grove, Whittier Heights, and Broughton. To aid in the development of these neighborhoods and to manage the common areas, the Bagwells formed three non-profit entities to serve as homeowners associations and referred to these entities as "Maintenance Associations."

9. The names of the "Maintenance Associations" formed by or at the behest of the Bagwells are Old Grove Maintenance Association, Inc. ("OGMA"), Whittier Heights Maintenance Association, Inc. ("WHMA"), and Broughton Maintenance Association, Inc. ("BMA").

10. At all times relevant, the ~~ostensible~~ purpose of OGMA, WHMA, and BMA (collectively "HOAs") was, *inter alia*, to own and maintain the common areas of the Old Grove, Broughton, and Whittier Heights neighborhoods, and ultimately to serve as the homeowners association for each respective neighborhood.

11. The non-profit HOAs were not considered by David and/or Susan Bagwell to be a part of the Bagwell "family business."

12. At the time each of the three HOAs was formed, the Bagwells controlled each HOA and appointed themselves and their long-time friend and business associate, Dale Crane, as officers and directors of and for each of the three HOAs. Thus, the board of directors and corporate officers for OGMA, WHMA, and BMA were David Bagwell, Susan Bagwell and Dale Crane.

13. The Bagwells and Dale Crane ceased to be officers and directors of OGMA on August 5, 2011.

14. The Bagwells and Dale Crane ceased to be officers and directors of BMA on August 11, 2011.

15. The Bagwells and Dale Crane ceased to be officers and directors of WHMA on August 31, 2011.

16. The Bagwells and Dale Crane will sometimes be referred to hereafter, collectively, as the "ex-Directors."

17. During the time the ex-Directors served as directors for OGMA, BMA, and WHMA, the Bagwells operated the HOAs to benefit themselves and their "family business" entities.

18. During the time the ex-Directors served as directors for OGMA, BMA, and WHMA, they caused each of the three HOAs to contract with the Bagwell "family business" entity Evermore.

19. Evermore's ostensible purpose was to provide grounds maintenance and accounting services for each of the three HOAs.

20. David Bagwell represented to investors in, and purchasers of lots from, the Limited Partnerships that Evermore's services were being provided to the HOAs "at cost" or on a not-for-profit basis. This representation was false.

21. Evermore adopted the for-profit pricing of Silvercreek Management, the predecessor management company for the HOAs. Silvercreek Management was a for-profit entity which performed the same functions Evermore was contracted to perform.

22. The Bagwells caused each of the three HOAs to enter into contracts with Evermore, and such contracts were signed by David Bagwell--who signed on behalf of each of the three HOAs and on behalf of Evermore ("Evermore Contracts").

23. At the Bagwells' direction, revenue of Evermore was typically distributed to DBCo, and thereafter distributed to the Bagwells, or used by the Bagwells to support the "family business."

24. With regard to the Evermore Contracts, there was a failure to prove, by a preponderance of the credible evidence, a date upon which any of such contracts was authorized,

approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

25. With regard to the Evermore Contracts, there was a failure to prove, by a preponderance of the credible evidence, that any of such contracts was authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

26. While Evermore may have provided some services to the HOAs,-Evermore was also used by the Bagwells as a conduit to direct HOA money to the Bagwells and the Bagwell family business entities, including the Limited Partnerships.

27. The Bagwells also used Evermore to provide maintenance and accounting services for the Limited Partnerships and used HOA money to pay for such services.

28. The Bagwells also used Evermore to provide accounting services for other Bagwell family business entities and used HOA money to pay for such services.

29. The ex-Directors benefitted from Evermore's services to the Limited Partnerships by virtue of their interests in the Limited Partnerships, either directly or indirectly through Broadacre Partners, which was a limited partner in each of the Limited Partnerships.

30. With regard to the Evermore Contracts, there was a failure to prove, by a preponderance of the credible evidence, that there was a single disinterested director serving on the Board of Directors for the HOAs on or about any of the dates on which such contracts were allegedly signed by Mr. Bagwell on behalf of the HOAs and on behalf of Evermore.

31. With regard to the Evermore Contracts, there was a failure to prove, by a preponderance of the credible evidence, that any of such contracts were fair and equitable to the HOAs on or about any of the dates on which such contracts were allegedly signed by Mr. Bagwell on behalf of the HOAs and on behalf of Evermore.

32. David Bagwell represented that Evermore's accounting services were being provided by "his accountant," Pamela Cariaga.

33. Pamela Cariaga held herself out (and her business PJC Accounting) as a provider of accounting services when neither she nor her business entity were licensed by the State of Texas. ~~This representation was false, as neither Ms. Cariaga nor her business are licensed to provide accounting services in the State of Texas~~.

34. When Ms. Cariaga was deposed and was questioned about her holding herself out as an accountant when she was not licensed by the State of Texas, Ms. Cariaga refused to answer multiple questions, including questions concerning the operations of one or more of the Bagwell "family business" entities, by claiming her privilege afforded to her under the Fifth Amendment to the Constitution of the United States of America.

35. The Court finds that the ex-Directors knew or should have known that Ms. Cariaga was not a licensed accountant.

36. Pamela Cariaga and PJC Accounting handled accounting and bookkeeping functions for the HOAs, as well as the other Bagwell "family business" entities.

37. The ex-Directors failed to provide an accounting for how HOA money was spent by the ex-Directors during the time they served as Officers and Directors of the HOAs.

38. The ex-Directors failed to introduce credible evidence to prove that the HOAs benefitted from the HOA money spent during the time they served as Officers and Directors of the HOAs.

39. The Court was unable to determine, based upon a preponderance of the credible evidence, that HOA money was not improperly used to benefit the Bagwells and/or the Bagwell "family business" entities, including Sister Initiative, DBCo, and the Limited Partnerships.

40. There was a failure to prove, by a preponderance of the credible evidence, that HOA money was not used to pay for the accounting and bookkeeping services provided by Pamela Cariaga and/or PJC Accounting for the Bagwell "family business" entities.

41. HOA money was improperly used to benefit the Bagwells and/or their "family business" entities, including Sister Initiative, DBCo, and the Limited Partnerships.

42. One of the most critical functions of OGMA, BMA, and WHMA was to collect the regular assessments owed by the property owners in each of the three neighborhoods.

43. At all times relevant, each of the Limited Partnerships owned a significant number of lots in each neighborhood and each Limited Partnership was the largest single debtor of its respective HOA as a result of the failure to pay its assessments.

44. During the time the ex-Directors controlled OGMA, BMA, and WHMA, the Limited Partnerships defaulted on the bank loans they had used for the purchase and development of the three neighborhoods.

45. The Limited Partnerships' inability to make their loan payments resulted from a lack of lot sales due in part to a lack of demand for lots in neighborhoods controlled by the Bagwells.

46. The lack of demand was due, in part, to the "toxic environment" created by David Bagwell and the members of the Architectural Control Committee ("ACC") for each of the HOAs, who were operating under the direction and control of Mr. Bagwell.

47. The ex-Directors caused the HOAs to adopt a plan by which fees were charged for various interactions between property owners and the ACC, including the submission of various types of plans, and resubmission of plans.

48. During the ex-Directors' control of the HOAs, those serving on the ACCs received a portion of the fees charged by the ACCs for their services as members of the ACC.

49. At all times relevant, the HOAs and their respective ACCs engaged in arbitrary, capricious, and sometimes punitive actions toward property owners in each of the neighborhoods.

50. In addition to the arbitrary, capricious and sometimes punitive actions towards the property owners, the ACCs charged and collected unreasonable fees from property owners trying to meet ACC standards that shifted at the whim of the ex-Directors.

51. The ex-Directors caused a portion of the fees generated by the ACCs to provide additional compensation for ACC members, including Taylor Steele.

52. These actions by the ACCs at the behest of the ex-Directors further contributed to the "toxic environment" that existed in the neighborhoods controlled by the ex-Directors.

53. At times during which the ex-Directors were serving as Officers and Directors for the HOAs, the Limited Partnerships failed to pay their regular assessments to their respective HOAs.

54. The failure of the Limited Partnerships to pay their regular assessments resulted in a reduction in cash flow to each of the three HOAs.

55. Because of their direct and indirect financial interests in the Limited Partnerships, and their preference for the success of the Limited Partnerships, even at the expense of the HOAs, the ex-Directors failed to take appropriate and effective action to collect the amounts owed by the Limited Partnerships to the HOAs.

56. It would have been against the financial interests of the ex-Directors to have taken action to enforce the deed restrictions against, and collect assessments from, the Limited Partnerships.

57. At the same time, the ex-Directors did take actions to collect delinquent assessments from individual property owners with whom the ex-Directors had no business relationships.

58. At all times during which the Limited Partnerships failed to pay their required assessments, the ex-Directors each had a conflict of interest as Officers and Directors of the HOAs in view of their ownership and/or financial interests in the Limited Partnerships, which were in arrears on their assessments.

59. By failing to take appropriate and effective steps to collect the delinquent assessments owed by the Limited Partnerships, the ex-Directors caused each of the HOAs to suffer inadequate cash flow, which then reduced the cash available to flow from the HOAs to Evermore, which limited the Bagwells' access to HOA money to support the Bagwells, the Bagwell family members, and/or the Bagwell family business entities.

60. The reduction in cash flow as a result of the Limited Partnerships' failure to pay assessments caused the Bagwells to dramatically reduce the scope of Evermore's landscape maintenance services for the HOAs' respective common areas.

61. There was no credible evidence that established the value of the maintenance services provided by Evermore at any point in time prior to the curtailing of the Evermore landscape maintenance services.

62. Following the ex-Directors' decision to curtail Evermore's landscape maintenance services to the HOAs, the landscape maintenance services provided to the HOAs' common areas

was sporadic and of such poor quality that it amounted to negligible landscape maintenance services.

63. There was no credible evidence that established the value of the negligible landscape maintenance services provided by Evermore after the decision to curtail the Evermore landscape maintenance services.

64. Following the ex-Directors' decision to curtail Evermore's landscape maintenance services to the HOAs and failure to ensure payment of water and electricity bills, water was shut-off to the HOAs and electricity was significantly limited, thus resulting in further deterioration of the condition of the HOAs' common areas.

65. The reduction in Evermore landscape maintenance services to the HOAs' common areas resulted in the deterioration of the common areas to such an extent that certain homeowners in each of the HOAs organized groups to provide these services and pay for common area utilities themselves.

66. Though the Evermore landscape maintenance services to the HOAs' common areas was dramatically curtailed, the HOAs received no corresponding reduction in the monthly charges from Evermore.

67. The reduction in the Evermore landscape maintenance services further contributed to the "toxic environment" that existed in the neighborhoods controlled by the ex-Directors.

68. The "toxic environment" included legal actions, including lawsuits between the HOAs and multiple individual property owners.

777

83

69. The cost of such legal actions further reduced the availability of HOA money, which further reduced the Evermore revenue available to the Bagwells and the Bagwell family business entities.

70. The HOAs, under the control of the ex-Directors, also failed to pay several of the law firms that provided services to the HOAs, resulting in multiple claims and one lawsuit being pursued against the HOAs.

71. The HOAs were forced to settle with their former lawyers, resulting in harm to the HOAs, both in terms of the settlements paid, and the fees paid to defend the HOAs in those cases.

72. ~~The "toxic environment" culminated in the 2009 formation of an entity,~~ In 2009 an entity was formed by a group of property owners from each of the three neighborhoods, called Colleyville Home Owners' Rights Association, Inc. ("CHORA"). *R pw*

73. CHORA filed a lawsuit against the Limited Partnerships and the HOAs in the 352nd Judicial District Court of Tarrant County, Texas (the "CHORA Lawsuit"), with the primary goal of removing and replacing the ex-Directors with new HOA officers and directors who would honor their fiduciary duties to the HOAs and presumably have a more positive working relationship with the property owners.

74. The ex-Directors decided to defend against the CHORA Lawsuit in an effort to maintain their control over the HOAs.

75. Although the HOAs were in a difficult financial position, the ex-Directors funneled HOA monies to the defense of the Limited Partnerships against the CHORA Lawsuit.

778

84

76. On September 20, 2010, the 352nd District Court issued an injunction prohibiting the use of any HOA assessment money for legal fees incurred in the defense of the CHORA Lawsuit.

77. The ex-Directors then caused HOA assessments to be paid to Evermore and the Bagwells then directed Evermore to pay legal fees incurred in the defense of the CHORA Lawsuit. Evermore was never a party to the CHORA Lawsuit.

78. Mr. Bagwell caused each of the Limited Partnerships to declare bankruptcy in an effort, *inter alia*, to forestall and/or prevent Limited Partnership assets (primarily consisting of unsold lots in each of the three neighborhoods) from being foreclosed upon and/or sold.

79. In light of the dire financial condition of the Limited Partnerships, Mr. Bagwell attempted to raise additional capital from his limited partners in the Limited Partnerships.

80. On August 15, 2010, Mr. Bagwell stated to his limited partners that, because the Limited Partnerships were temporarily unable to contribute their share of quarterly assessments to the HOAs "that our partner Dale Crane, my wife Susan and I run as directors and officers," the HOAs are unable to pay "my Evermore Corp, which provides basic accounting services and grounds maintenance to [the HOAs] and to other entities, including [the Limited Partnerships]." Mr. Bagwell suggested his limited partners could make short term loans to the HOAs without becoming creditors to the Limited Partnerships, and thereby "support my company's efforts to lead the partnership(s) out of bankruptcy without becoming a creditor." (Exh. 210).

81. As a part of his requests for short term loans to the HOAs, Mr Bagwell represented that loans made to the HOAs were safe investments and that "the likelihood of repayment with interest is assured." (Exh. 504).

85

82.   The Bagwells made representations to potential lenders, including the Bagwells' daughters, that loaning money to the HOAs was a sound and safe investment because the loans would be secured by the future assessments paid by the property owners, which were secured by the ability of the HOAs to obtain liens on the property and homes of the property owners in the neighborhoods.

83.   As a potential lender, Mr. Bagwell's sister (Judy Sellers) was told that she could support the Bagwell family business, including the Limited Partnerships, by "loaning" money to the HOAs.

84.   Instead, Judy Sellers loaned $10,000.00 to the Bagwells, the Bagwells then loaned $10,000.00 to Sister Initiative, Sister Initiative then "loaned" most of the $10,000.00 to the HOAs ($2,150.00 to BMA, $3,600.00 to OGMA, and $2,675.00 to WHMA), the HOAs then paid Evermore the proceeds of the "loans" ($2,130.50 from BMA, $3,583.50 from OGMA, and $2,608.00 from WHMA), Evermore then transferred $7,000.00 to DBCo, and DBCo then transferred money to the bankrupt Limited Partnerships ($1,150.00 to Broughton, LP, $1,700.00 to Old Grove, LP, and $1,450.00 to Broadland, LP). (Exh. 595L). The foregoing transfers were approved by the Bagwells and accomplished almost immediately.

85.   Similarly, Mr. Bagwell offered Dale Crane multiple options to provide cash flow to the Bagwell family business entities, including the option of loaning money to BMA, assuring Mr. Crane that "either way money comes into DBCo for use to pay pressing bills." (Exh. 219).

86.   As part of their discussions with potential lenders, including Sister Initiative and Stonegate, the Bagwells represented that loans made to the HOAs were safe investments and that there would be a high probability of a good return.

87. A variety of loan structures were discussed and used, but all accomplished the same thing-- providing cash flow to the HOAs, then to Evermore, and then to DBCo to be used for the benefit of the Bagwells and the Bagwell family business entities.

88. There was no credible evidence that the HOAs owed EMC any money.

89. None of the ex-Directors contacted, or applied for a loan with, any traditional lenders or banks.

90. Mr. Bagwell attempted to encourage a potential lender to make a loan to one of the HOAs by representing that "repayment with interest is assured." In response, the potential lender declined to make a loan to the HOAs "as a vehicle for getting you cash flow," and warned Mr. Bagwell that such loans may be improper because it would appear that Mr. Bagwell "did this for purposes outside the mandate of the HOA." (Exh. 504).

91. At trial, the ex-Directors claimed that the Sister Initiative and Stonegate loans to the HOAs were extremely risky, which, allegedly, justified the short duration, high contractual and default interest rates, and the other terms set forth in the loan documents.

92. The positions taken by the ex-Directors at trial with regard to the relative risk involved in loaning the HOAs money was contradicted by representations made by the Bagwells to potential lenders.

93. The Bagwells intended any money loaned to the HOAs to be quickly removed from the HOAs and distributed in such a way as to benefit the Bagwells and the Bagwell family business entities.

94. The Bagwells intended to use Sister Initiative and Stonegate money, putatively loaned to the HOAs, to continue to fund the Bagwell family business entities and pay for certain personal expenses of the Bagwells, including grocery bills and other household bills.

95.     As a part of the Bagwells' plan to use Sister Initiative and Stonegate money to benefit themselves and the Bagwell family business entities, the Bagwells determined that it would be in their best interest to cause the Sister Initiative and Stonegate money to flow through the HOAs in order to create the semblance of loans to the HOAs, which would then allow Sister Initiative and Stonegate to sue the HOAs to recover the putative loan proceeds plus interest and attorney's fees, knowing that such loans were secured by liens on future assessments owed to the HOAs by property owners.

96.     The Bagwells caused Sister Initiative, and Crane caused Stonegate, to bring this lawsuit against the HOAs in order to collect debts allegedly owed by the HOAs to Sister Initiative and Stonegate as a result of multiple putative loan agreements between Sister Initiative and Stonegate, as lenders, and the HOAs, as borrowers, that were allegedly entered into during the time the ex-Directors served as officers and directors of the HOAs.

97.     By its claims against each of the HOAs, Sister Initiative sought to enforce the terms of written loan agreements ostensibly entered into between Sister Initiative and the HOAs on dates when Mr. Bagwell, who identified his signature (ostensibly signing such agreements on behalf of each of the HOAs) on the written agreements at issue, was an officer and/or director of such HOAs.

98.     By its claims against OGMA and BMA, Stonegate sought to enforce the terms of written loan agreements ostensibly entered into between Stonegate and OGMA and BMA on dates when David Bagwell, who identified his signature (ostensibly signing such agreements on behalf of each of the HOAs) on the written agreements at issue, was an officer and/or director of OGMA and BMA.

99.    The ex-Directors created and executed a back-dated Consent for each of the HOAs dated June 10, 2010, which did not authorize the ex-Directors to enter into any loans with Sister Initiative or Stonegate. There is no credible evidence that any of the loans or purported loan documents, that form the bases of Sister Initiative's claims and Stonegate's claims, were considered, voted on, and/or approved by the board members of the HOAs at any time prior to September 1, 2011.

100.    The Court finds that the trial testimony of David Bagwell, Susan Bagwell, Pamela Cariaga, and Taylor Steele, given in support of Sister Initiative's claims against the HOAs and given in support of defending the HOAs claims against the Bagwells and Sister Initiative, was not credible and should be accorded no evidentiary weight.

101.    While the Court admitted into evidence copies of the putative written agreements that Sister Initiative attempted to enforce against the HOAs (the "Sister Initiative loan documents"), the Court believes the Sister Initiative loan documents lack authenticity, and further finds that Sister Initiative failed to establish by a preponderance of the credible evidence that such loan documents were signed by Mr. Bagwell at a time when he had the authority to enter into agreements on behalf of the HOAs. The Court does not believe the Sister Initiative loan documents were signed by Mr. Bagwell at a time when he had the authority to enter into agreements on behalf of the HOAs.

102.    While the Court admitted into evidence copies of the Sister Initiative loan documents that form the bases of Sister Initiative's claims against the HOAs, the Court assigns such exhibits no weight as evidentiary support for Sister Initiative's claims against the HOAs.

103.    With regard to the Sister Initiative loan documents, there was a failure to prove, by a preponderance of the credible evidence, a date upon which any such loan documents were

authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

104. With regard to the Stonegate loan documents, there was a failure to prove, by a preponderance of the credible evidence, a date upon which any such alleged loan documents were authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

105. With regard to the Sister Initiative loan documents, there was a failure to prove, by a preponderance of the credible evidence, that any such alleged written agreements were authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

106. With regard to the Stonegate loan documents, there was a failure to prove, by a preponderance of the credible evidence, that any such alleged written agreements were authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

107. With regard to the Sister Initiative loan documents, there was a failure to prove, by a preponderance of the credible evidence, that there was a single disinterested director serving on the Board of Directors for the HOAs on or about any of the dates on which such putative written agreements were allegedly signed by Mr. Bagwell on behalf of the HOAs.

108. With regard to the Stonegate loan documents, there was a failure to prove, by a preponderance of the credible evidence, that there was a single disinterested director serving on the Board of Directors for OGMA and BMA on or about any of the dates on which such putative written agreements were allegedly signed by Mr. Bagwell on behalf of OGMA and BMA.

784

90

109. With regard to the Sister Initiative loan documents, there was a failure to prove, by a preponderance of the credible evidence, that the terms of such written agreements were fair and equitable to any of the HOAs on or about any of the dates on which such alleged written agreements were allegedly signed by Mr. Bagwell on behalf of the HOAs.

110. There were no arms-length negotiations over the terms of the loans as set forth in the Sister Initiative and Stonegate loan documents.

111. The Bagwells made no effort to obtain loans to the HOAs on more favorable terms than those set forth in the Sister Initiative and Stonegate loan documents.

112. The Sister Initiative loan documents, upon which Sister Initiative bases its claims, are backdated documents.

113. To the extent money was transferred from Sister Initiative to any of the HOAs, there was a failure to prove, by a preponderance of the credible evidence, that any such particular transfer of money constituted a loan that was authorized, approved, or ratified, formally or otherwise, by a vote of the Board of Directors for the relevant HOA.

114. To the extent money was transferred from Sister Initiative to any of the HOAs, there was a failure to prove, by a preponderance of the credible evidence, that any such particular transfer of money constituted a loan that was fair and equitable to the HOA that allegedly received such transfer of money.

115. To the extent money was transferred from Sister Initiative to any of the HOAs, the Bagwells did not intend that money to be used for the benefit of the HOAs but, at all times relevant, intended that money to further the personal and business interests of the Bagwells and the Bagwell family business entities, at the expense or to the detriment of the HOAs.

91

116. To the extent money was transferred from Sister Initiative or Stonegate to any of the HOAs, the HOAs received no material benefit from such money as it was almost immediately removed from the HOAs' bank accounts by the Bagwells to further the personal and business interests of the Bagwells and the Bagwell family business entities.

117. Many of the putative loans purport to have been made at a time when the HOAs were already in default on prior putative loans.

118. All of the loans in question were the product of self-dealing by the Bagwells, and each of the Bagwells benefitted, either directly or indirectly, from each and every loan at issue.

119. During the time the Bagwells served as officers and directors of the HOAs, the Bagwells failed as follows:

    a. to make reasonable use of the confidence that was placed in them by each of the HOAs;

    b. to act in the utmost good faith toward the HOAs;

    c. to exercise the most scrupulous honesty toward the HOAs; and

    d. to place the interests of the HOAs before their own interests.

120. During the time the Bagwells served as officers and directors of the HOAs, the Bagwells, used the advantage of their positions as officers and directors of the HOAs to gain benefits for themselves at the expense of the HOAs.

121. The Bagwells intentionally and/or recklessly placed themselves in a position in which their self-interest conflicted with the fiduciary duties that each of them owed to the HOAs.

122. The Bagwells engaged in self-dealing in their control and use of EMC and Sister Initiative in order to gain possession of the HOAs' cash.

786

92

123. David and Susan Bagwell's breaches of fiduciary duty were intentional and designed to injure the HOAs or obtain an undue and unconscientious advantage in favor of the Bagwells, including the Bagwell family business entities.

124. At all relevant times the Bagwells and Sister Initiative:

a. All had knowledge of the plan to wrongfully divert cash of the HOAs to the Bagwells and Bagwell family business entities;

b. All intended and agreed to wrongfully divert cash of the HOAs to the Bagwells and Bagwell family business entities; and

c. All participated in the wrongful diversion of cash of the HOAs to the Bagwells and Bagwell family business entities.

125. The conduct of the Bagwells in the wrongful diversion of cash of the HOAs to themselves and Bagwell family business entities injured the HOAs.

126. To the extent there were loans to the HOAs by Sister Initiative, such loans were sham loans designed solely to provide cash to the Bagwells and Bagwell family business entities.

127. The conduct of the Bagwells in breaching their fiduciary duties to the HOAs, caused injury to the HOAs.

128. Sister Initiative failed to prove by a preponderance of the credible evidence that the HOAs held money that, in equity and good conscience, belongs to Sister Initiative.

129. As a result of the wrongful conduct of Sister Initiative and the Bagwells, OGMA suffered actual damages in the amount of $8,366.07 for which Sister Initiative and the Bagwells are jointly and severally liable.

787

93

130.     As a result of the wrongful conduct of Sister Initiative and the Bagwells, BMA suffered actual damages in the amount of $18,711.43 for which Sister Initiative and the Bagwells are jointly and severally liable.

131.     As a result of the wrongful conduct of Sister Initiative and the Bagwells, WHMA suffered actual damages in the amount of $18,206.25 for which Sister Initiative and the Bagwells are jointly and severally liable.

132.     In the fall of 2011, Sister Initiative, Stonegate and Randy Vest jointly retained Bracewell to pursue their claims against the HOAs related to the putative loans in question.

133.     Sister Initiative failed to segregate the Bracewell legal fees incurred in the representation of Sister Initiative, as opposed to those incurred in the representation of Stonegate or Randy Vest.

134.     Stonegate failed to segregate the Bracewell legal fees incurred in the representation of Stonegate, as opposed to those incurred in the representation of Sister Initiative or Randy Vest.

135.     When the HOAs filed counterclaims against Sister Initiative, Stonegate and Randy Vest, and added third-party claims against David Bagwell, Susan Bagwell, Dale Crane and Randy Vest, Bracewell continued to defend all of those claims asserted by the HOAs.

136.     Sister Initiative also failed to segregate the Bracewell legal fees incurred in the representation of Sister Initiative, as opposed to those incurred in the representation of David Bagwell, Susan Bagwell, Dale Crane or Randy Vest.

137.     Stonegate also failed to segregate the Bracewell legal fees incurred in the representation of Stonegate, as opposed to those incurred in the representation of David Bagwell, Susan Bagwell, Dale Crane or Randy Vest.

788

94

138. Sister Initiative also failed to segregate the Bracewell legal fees incurred that related solely to claims for which such fees are unrecoverable, as opposed to those fees related solely to claims for which such fees are recoverable.

139. Stonegate also failed to segregate the Bracewell legal fees incurred that related solely to claims for which such fees are unrecoverable, as opposed to those fees related solely to claims for which such fees are recoverable.

140. Some of the legal services provided by Bracewell did not advance both recoverable and non-recoverable claims.

141. The amount in controversy with regard to the Stonegate notes to OGMA was $2,073.72, including interest, and the amount in controversy with regard to the Stonegate notes to BMA was $6,955.38, including interest.

142. The Court has carefully reviewed the billing statements of Bracewell and considered the testimony of Kevin Schutte. The Court finds that the amount of $11,706.15 is a reasonable fee for the necessary services rendered by Bracewell on behalf of Stonegate in the collection of the Stonegate notes pertaining to OGMA. The Court further finds that any amount of fees paid to Bracewell in excess of $11,706.15 were not reasonable or necessary in connection with the collection of the Stonegate notes pertaining to OGMA, and therefore any recovery of fees for collection of the OGMA notes by Stonegate in excess of $11,706.15 would be unconscionable, particularly in light of the amount in controversy.

143. The Court has carefully reviewed the billing statements of Bracewell and considered the testimony of Kevin Schutte. The Court finds that the amount of $57,153.55 is a reasonable fee for the necessary services rendered by Bracewell on behalf of Stonegate in the collection of the Stonegate notes pertaining to BMA. The Court further finds that any amount of

95

fees paid to Bracewell in excess of $57,153.55 were not reasonable or necessary in connection with the collection of the Stonegate notes pertaining to BMA, and therefore any recovery of fees for collection of the BMA notes by Stonegate in excess of $57,153.55 would be unconscionable, particularly in light of the amount in controversy.

144. In rendering the foregoing findings and awards related to recovery of legal fees, the Court considered the relevant factors set forth in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818-19 (Tex. 1997), as well as *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006).

145. To the extent any of the foregoing findings of fact constitute a conclusion of law, such conclusions are incorporated in section III. below.

## III.
## CONCLUSIONS OF LAW

1. As a matter of law and at all times relevant, David Bagwell, Susan Bagwell and Dale Crane each owed fiduciary duties to the HOAs while they served as officers and directors of the HOAs. *See Pepper v. Litton*, 308 U.S. 295, 306-07, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963); *Gearhart Industries, Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 719-21 (5th Cir. 1984).

2. As a matter of law and at all times relevant, David Bagwell and Susan Bagwell each owed fiduciary duties to DBCo and EMC, and DBCo owed fiduciary duties to each of the Limited Partnerships.

3. As a matter of law and at all times relevant, Susan Bagwell owed fiduciary duties to Sister Initiative.

4. As a matter of law and at all times relevant, Dale Crane owed fiduciary duties to Stonegate, Broadacre Partners and to Evermore Communities, Ltd.

790

96

5. Transactions involving interested directors, like those referenced above, are subject to strict judicial scrutiny and the burden to prove the fairness of the transactions at issue rested upon the fiduciary. *See Pepper v. Litton* 308 U.S. at 306; *Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex. 1965); *Popperman v. Rest Haven Cemetery, Inc.*, 345 S.W.2d 715, 718 (Tex. 1961); *Chien v. Chen*, 759 S.W.2d 484, 494-95 (Tex. App.–Austin 1988, no writ); TEX. BUS. ORGS. CODE § 22.230 (b)(2).

2. Sister Initiative and Stonegate had the burden to establish the existence of a valid and binding contract.

3. Sister Initiative had the burden to prove that, in equity and good conscience, money received by the HOAs pursuant to assessments and other income belonged to Sister Initiative.

4. Stonegate had the burden to prove that, in equity and good conscience, money received by the HOAs pursuant to assessments and other income belonged to Stonegate.

5. The Bagwells breached their fiduciary duties to the respective HOAs.

6. The Bagwells' breaches of fiduciary duty constitute fraud. *See Russell v. Industrial Transp. Co.*, 258 S.W. 462 (Tex. 1924); *Archer v. Griffith*, 390 S.W.2d 735 (Tex. 1965); *Price v. D'Yarmett*, 27 S.W.2d 616 (Tex. Civ. App. 1930, writ ref'd); *See Fid. Nat's Title Ins. Co. v. Heart of Tex. Title Co.*, No. 03–98–00437–CV, 2000 WL 13037 at *3 (Tex. App. – Austin Jan. 6, 2000, pet. denied)(mem. op.).

7. The Bagwells and Sister Initiative engaged in a conspiracy to commit unlawful acts against the HOAs and/or used unlawful means to accomplish a lawful objective.

8. The Bagwells and Sister Initiative aided and abetted each other in the process of committing unlawful acts against the HOAs.

9.     The HOAs claims against the Bagwells and Sister Initiative are not barred by operation of the doctrine of proportionate responsibility.

10.     The HOAs' claims against the Bagwells and Sister Initiative are not barred by any statute of limitations.

11.     The HOAs claims against The Bagwells and Sister Initiative are not barred by the doctrine of laches.

12.     The HOAs' claims against the Bagwells and Sister Initiative are not barred by the business judgment rule nor does the business judgment rule apply under the circumstances of this case.

13.     The HOAs' claims against the Bagwells and Sister Initiative are not barred by the doctrine of waiver.

14.     The HOAs' claims against the Bagwells and Sister Initiative are not barred by the doctrine of ratification.

15.     The HOAs' claims against the Bagwells and Sister Initiative are not barred by the doctrine of estoppel.

16.     The HOAs claims against the Bagwells and Sister Initiative were not discharged in Bankruptcy.

17.     The HOAs did not fail to mitigate their damages.

18.     As a result of the wrongful conduct of Sister Initiative, David Bagwell and Susan Bagwell, OGMA is entitled to compensatory damages in the amount of $8,366.07 for which Sister Initiative, David Bagwell and Susan Bagwell are jointly and severally liable.

792

98

19.    As a result of the wrongful conduct of Sister Initiative, David Bagwell and Susan Bagwell, BMA is entitled to compensatory damages in the amount of $18,711.43 for which Sister Initiative, David Bagwell and Susan Bagwell are jointly and severally liable.

20.    As a result of the wrongful conduct of Sister Initiative, David Bagwell and Susan Bagwell, WHMA is entitled to compensatory damages in the amount of $18,206.25 for which Sister Initiative, David Bagwell and Susan Bagwell are jointly and severally liable.

21.    The amounts awarded to OGMA, BMA and WHMA bears interest at a rate of five percent (5%) per annum from the date of final judgment until paid in full.

22.    Any promissory notes and/or loans between Sister Initiative and OGMA are illegal, void, and unenforceable.

23.    Any promissory notes and/or loans between Sister Initiative and BMA are illegal, void, and unenforceable.

24.    Any promissory notes and/or loans between Sister Initiative and WHMA are illegal, void, and unenforceable.

25.    Sister Initiative shall take nothing by way of its claims against the HOAs for breach of contract.

26.    Sister Initiative shall take nothing by way of its claims against the HOAs for money had and received.

27.    Sister Initiative had unclean hands in making the putative loans to the HOAs.

28.    Any obligations of the HOAs created by the putative Sister Initiative loan documents resulted from the Bagwells' breaches of fiduciary duty, and fraud. $\cancel{fraud}$

99

29.     Any enforcement of the putative Sister Initiative loan documents would be unconscionable because they resulted from self-dealing by the Bagwells as fiduciaries to the HOAs.

30.     There was no consideration for any loans from Sister Initiative to the HOAs.

31.     The terms of the putative Sister Initiative loan documents were not fair to the HOAs at or about the time of the putative dates of the putative loan documents.

32.     Sister Initiative is not entitled to recover attorneys' fees, court costs, or costs of collection under Texas law, including but not limited to, Chapter 38 of the Texas Civil Practice and Remedies Code or the putative Sister Initiative loan documents.

33.     Stonegate shall recover $2,073.72 from OGMA for breach of contract, plus $11,706.15 in reasonable and necessary attorney's fees incurred by Stonegate through the date of Final Judgment.

34.     Stonegate shall recover $6,955.38 from BMA for breach of contract, plus $57,153.55 in reasonable and necessary attorney's fees incurred by Stonegate through the date of Final Judgment.

35.     To the extent any of the foregoing conclusions of law constitute a finding of fact, such findings are incorporated in section II. above.

SIGNED this 6th day of ___Feb.___, 2018.

R.H. WALLACE, JR.
STATE DISTRICT JUDGE